"Not Filed Under Seal"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> TORRENT PHARMACEUTICALS LIMITED, INC., TORRENT PHARMA INC., and HETERO LABS LIMITED, <br> Defendants. | HONORABLE JEROME B. SIMANDLE <br><br> Civil Action Nos. <br> 14-1078 (JBS/KMW) <br> 14-2982 (JBS/KMW) <br> 14-3168 (JBS/KMW) <br> 14-4307 (JBS/KMW) <br> 14-4671 (JBS/KMW) <br> 14-5878 (JBS/KMW) <br> 14-6397 (JBS/KMW) <br> 14-6398 (JBS/KMW) <br> 14-7106 (JBS/KMW) <br> 14-7405 (JBS/KMW) <br> 14-8074 (JBS/KMW) <br> 15-161  (JBS/KMW) <br> 15-1716 (JBS/KMW) |
| OTSUKA PHARMACEUTICAL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> ALEMBIC PHARMACEUTICALS LIMITED, ALEMBIC LIMITED, ALEMBIC GLOBAL HOLDING SA, and ALEMBIC PHARMACEUTICALS INC., <br> Defendants. | |
| OTSUKA PHARMACEUTICAL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> ZYDUS PHARMACEUTICALS USA, INC. and CADILA HEALTHCARE LIMITED, <br> Defendants. | **REDACTED** OPINION |
| OTSUKA PHARMACEUTICAL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> SUN PHARMACEUTICAL INDUSTRIES LTD., SUN PHARMA GLOBAL INC., SUN PHARMA GLOBAL FZE, SUN PHARMA USA, SUN PHARMACEUTICALS INDUSTRIES, INC., and CARACO PHARMACEUTICAL LABORATORIES, <br> Defendants. | |

[Caption Continues]

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>TORRENT PHARMACEUTICALS LIMITED, INC., TORRENT PHARMA INC., and HETERO LABS LIMITED,<br>Defendants. | |

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC.,<br>Defendant. | |

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>SUN PHARMACEUTICAL INDUSTRIES LTD., SUN PHARMA GLOBAL INC., SUN PHARMA GLOBAL FZE, SUN PHARMA USA, SUN PHARMACEUTICALS INDUSTRIES, INC., and CARACO PHARMACEUTICAL LABORATORIES,<br>Defendants. | |

| | |
|---|---|
| OTSUKA PHARMACEUTICAL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC.,<br>Defendant. | |

[Caption Continues]

OTSUKA PHARMACEUTICAL CO.,
LTD.,

                    Plaintiff,

        v.


ACTAVIS ELIZABETH LLC,
ACTAVIS, INC., ACTAVIS PLC,
JUBILANT LIFE SCIENCES
LIMITED, JUBILANT GENERICS
LIMITED, and JUBILANT LIFE
SCIENCES (USA) INC.,
                    Defendants.

OTSUKA PHARMACEUTICAL CO.,
LTD.,

                    Plaintiff,

        v.


ALEMBIC PHARMACEUTICALS
LIMITED, ALEMBIC LIMITED,
ALEMBIC GLOBAL HOLDING SA, and
ALEMBIC PHARMACEUTICALS INC.,
                    Defendants.

OTSUKA PHARMACEUTICAL CO.,
LTD.,

                    Plaintiff,

        v.


APOTEX CORP., APOTEX INC.,
APOTEX PHARMACHEM INC., and
HETERO LABS LIMITED,
                    Defendants.

OTSUKA PHARMACEUTICAL CO.,
LTD.,

                    Plaintiff,

        v.


HETERO DRUGS LIMITED, HETERO
LABS LIMITED, and HETERO USA,
INC.,
                    Defendants.


                [Caption Continues]

```
OTSUKA PHARMACEUTICAL CO.,
LTD.,
                    Plaintiff,
      v.


SANDOZ INC., SANDOZ PRIVATE
LTD., and SANDOZ INTERNATIONAL
GMBH,
                    Defendants.
```

Appearances:

Melissa A. Chuderewicz, Esq.
Christopher P. Soper, Esq.
Brian R. Zurich, Esq.
PEPPER HAMILTON LLP
301 Carnegie Center, Suite 400
Princeton, New Jersey 08543
     -and-
Paul W. Browning, Esq. (argued)
Eric J. Fues, Esq. (argued)
James B. Monroe, Esq.
Denise Main, Esq.
Jeffrey A. Freeman, Esq.
Samhitha C. Muralidhar, Esq.
Eric J. Fues, Esq. (argued)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
     Attorneys for Otsuka Plaintiffs

James E. Cecchi, Esq.
Michael Cross, Esq.
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, PC
5 Becker Farm Road
Roseland, New Jersey 07068
     -and-
Claire J. Evans, Esq. (argued)
James. H. Wallace (argued)
A. Neal Seth, Esq.
Lawrence M. Sung, Esq.
Matthew J. Dowd, Esq.
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
     Attorneys for Torrent Defendants

Lisa J. Rodriguez, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS, LLP
220 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1165
     -and-
Dennies Varughese, Pharm.D., Esq. (argued)
Chandrika Vira, Esq.
H. Keeto Sabharwal, Esq.
Uma Everett, Esq.
STERNE, KESSLER, GOLDSTEIN & FOX
1100 New York Avenue, N.W.
Washington, D.C. 20005
    Attorneys for Alembic Defendants

Trent S. Dickey, Esq.
Vincent R. Lodato, Esq.
Amy Megan Handler, Esq.
SILLS, CUMMIS, & GROSS, PC
One Riverfront Plaza
Newark, New Jersey 07102
     -and-
Delphine Knight Brown, Esq.
Chad A. Landmon, Esq. (argued)
AXINN, VELTROP & HARKRIDER, LLP
114 West 47th Street
New York, New York 10036
    Attorneys for Zydus Defendants

Gregory D. Miller, Esq.
PODVEY, MEANOR, CATENACCI, HILDNER, COCOZIELLO & CHATTMAN, P.C.
One Riverfront Plaza, Suite 800
Newark, New Jersey 07102
     -and-
Martin B. Pavane, Esq. (argued)
Julia S. Kim, Esq.
Darren S. Mogil, Esq.
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
    Attorneys for the Sun Defendants

Michael E. Patunas, Esq.
Mayra V. Tarantino, Esq.
LITE, DEPALMA & GREENBERG, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
     -and-

Christopher T. Holding, Esq. (argued)
Srikanth K. Reddy, Esq. (argued)
Elizabeth J. Holland, Esq.
Naomi Birbach, Esq.
GOODWIN PROCTOR, LLP
620 Eighth Avenue
New York, New York 10018
        Attorneys for the Teva Defendants


Liza M. Walsh, Esq.
Christine Intromasso Gannon, Esq.
Christopher J. Borchert, Esq.
Eleonore Ofosu-Antwi, Esq.
Rukhsanah L. Singh, Esq.
CONNELL FOLEY, LLP
86 Livingston Avenue
Roseland, New Jersey 07068
        -and-
B. Jefferson Boggs, Jr., Esq. (argued)
Christopher J. Soreson, Esq.
Rachel C. Hughley, Esq.
Matthew L. Fedowitz, Esq.
MERCHANT & GOULD
80 South Eighth Street
Minneapolis, Minnesota 55402
        Attorneys for the Actavis Defendants


David Leit, Esq.
Lawrence Bluestone, Esq.
LOWENSTEIN SANDLER, PC
65 Livingston Avenue
Roseland, New Jersey 07068-1791
        -and-
William A. Rakoczy, Esq. (argued)
Joseph T. Jaros, Esq.
Deanne M. Mazzochi, Esq.
Yixin H. Tang, Esq.
Neil B. Mclaughlin, Esq.
RAKOCZY, MOLINA, MAZZOCHI, SIWIK, LLP
6 West Hubbard Street
Chicago, Illinois 60654
        Attorneys for the Apotex Defendants


David Leit, Esq.
Lawrence Bluestone, Esq.
LOWENSTEIN SANDLER, PC
65 Livingston Avenue

Roseland, New Jersey 07068-1791
     -and-
Margaret E. Ives, Esq.
Phoebe Fischer-Groban, Esq.
Vanessa A. Arslanian, Esq.
CHOATE, HALL & STEWARD, LLP
Two International Place
Boston, Massachusetts 02110
     Attorneys for the Hetero Defendants

Kegan A. Brown, Esq.
Daniel G. Brown, Esq. (argued)
Roger J. Chin, Esq.
LATHAM & WATKINS, LLP
885 Third Avenue
New York, New York 10022
     Attorneys for the Sandoz Defendants

**SIMANDLE, Chief Judge:**

I.    INTRODUCTION ........................................................ 8

II.   BACKGROUND .......................................................... 13

  A.  Factual and Procedural Background ...................... 13

III.  PRELIMINARY ISSUES ............................................. 18

  A.  Otsuka's Motions to Amend ............................... 18

  B.  Informal Applications to Strike ........................ 21

IV.   STANDARD OF REVIEW APPLICABLE TO MOTIONS FOR TEMPORARY
RESTRAINING ORDER ......................................................... 24

V.    DISCUSSION .......................................................... 25

  A.  Likelihood of Success .................................. 25

    1.  Otsuka Has Not Demonstrated a Likelihood of Success on
    its Induced Infringement Claims ........................... 27

      a.  Standard for Induced Infringement ................. 30

        i.  Claim Construction: Claim 1 of the '350 Patent
        Discloses a Composition, Namely a Tablet, Comprised of a
        Single Dosage that Contains At Least Two Active
        Ingredients ........................................... 31

        ii.  Otsuka Has Not Demonstrated That Defendants'
        Proposed ANDA Products Directly Infringe Construed Claim 1
        of the '350 Patent .................................... 44

iii.  Otsuka Has Not Shown that Defendants Actively and
Purposefully Encouraged Infringement ................... 46

a.  Defendants' "Carve Out" of the Relevant Indication
Significantly Diminishes Any Suggestion of Sufficiently
Intentional Action ................................... 48

b.  Defendants' Proposed Labels Do Not Reflect Actual
Instruction in Furtherance of Inducing Infringement .. 51

c.  The Substantial Non-Infringing Uses Further Diminish
Any Inference of the Requisite Specific Intent to Induce
Infringement ........................................ 70

2.  Defendants Have Raised a Substantial Question of
Invalidity ............................................... 72

B.  Otsuka Has Not Demonstrated that it Will Suffer Immediate
and Irreparable Harm in the Absence of an Injunction as a
result of the Market Entry of these Defendants' Aripiprazole
Products ................................................... 80

1.  Otsuka's Alleged Harms Are Quantifiable ............. 81

2.  Otsuka Has Not Met the "Causal Nexus" Requirement .... 86

3.  Otsuka's Delay in Requesting Injunctive Relief Suggests
Lack of Urgency ......................................... 91

C.  The Balance of Hardships Favors these Defendants ....... 95

D.  The Public Interest Counsels against the Issuance of an
Injunction ................................................. 98

VI.  CONCLUSION........................................... 100

## I.  INTRODUCTION

These related patent infringement actions under the Hatch-
Waxman Act, 35 U.S.C. §§ 271, 281, generally concern Plaintiff
Otsuka Pharmaceutical Co, Ltd.'s (hereinafter, "Otsuka")
position that various defendants' submissions of abbreviated new
drug applications (hereinafter, "ANDAs") infringe one or more
claims of the various patents covering Otsuka's Abilify®

aripiprazole product, U.S. Patent Nos. 5,006,528 ("the '528 patent"), 7,053,092 ("the '092 patent"), 8,017,615 ("the '615 patent"), 8,580,796 ("the '796 patent"), 8,642,600 ("the '600 patent"), 8,642,760 ("the '760 patent"), and 8,759,350 ("the '350 patent").

As the lengthy exclusivity period for the original compound patent covering Abilify®, the '528 patent, comes to close on April 20, 2015, Otsuka moves to enjoin these Defendants[1] from launching generic aripiprazole products on or after April 20, 2015.  Otsuka's present motions for a Temporary Restraining Order and preliminary injunctive relief concern, in particular, the following generic Defendants and their requests for FDA approval of the following ANDAs:

1. Torrent Pharmaceuticals Limited, Inc., Torrent Pharma Inc., and Hetero Labs Limited **(collectively, "Torrent")**, Civil Action Nos. 14-1078 (JBS/KMW), 14-4671 (JBS/KMW), seek FDA approval to sell generic aripiprazole ██████████████████████ ████ ;

2. Alembic Pharmaceuticals Limited, Alembic Limited, Alembic Global Holding Sa, and Alembic Pharmaceuticals Inc. **(collectively, "Alembic")**, Civil Action Nos. 14-2982 (JBS/KMW), 14-7405 (JBS/KMW), seek FDA approval to sell generic aripiprazole ████████████████ ████████████████████████████████████████████ ;

---

[1] Otsuka originally sought injunctive relief in these and ten other related cases.  However, because certain defendants filed notices, in lieu of oppositions to Otsuka's motions for temporary restraining order, stating that each defendant did not intend to launch a generic aripiprazole product prior to June 20, 2015, the Court dismissed Otsuka's motions as against those opt-out defendants as moot on March 30, 2015.

3.    Zydus Pharmaceuticals USA, Inc., and Cadila Healthcare
      Limited **(collectively, "Zydus")**, Civil Action No. 14-
      3168 (JBS/KMW), seek FDA approval to sell generic
      aripiprazole ███████████████████████████████████████
      ████████████████████████████;

4.    Sun Pharmaceutical Industries Ltd., Sun Pharma Global
      Inc., Sun Pharma Global Fze, Sun Pharma USA, Sun
      Pharmaceuticals Industries, Inc., and Caraco
      Pharmaceutical Laboratories **(collectively, "Sun")**,
      Civil Action Nos. 14-4307 (JBS/KMW), 14-6397
      (JBS/KMW), seek FDA approval to sell generic
      aripiprazole ███████████████████████████████████████
      ████;

5.    Teva Pharmaceuticals USA, Inc. **(hereinafter, "Teva")**,
      Civil Action Nos. 14-5878 (JBS/KMW), 14-6398
      (JBS/KMW), seeks FDA approval to sell generic
      aripiprazole ███████████████████████████████████████
      ████████████;

6.    Actavis Elizabeth LLC, Actavis, Inc., Actavis PLC,
      Jubilant Life Sciences Limited, Jubilant Generics
      Limited, and Jubilant Life Sciences (USA) Inc.
      **(collectively, "Actavis")**, Civil Action No. 14-7106
      (JBS/KMW), seek FDA approval to sell generic
      aripiprazole ███████████████████████████████████████
      ████;

7.    Apotex Corp., Apotex Inc., Apotex Pharmachem Inc., and
      Hetero Labs Limited **(collectively, "Apotex")**, Civil
      Action No. 14-8074 (JBS/KMW), seek FDA approval to
      sell generic aripiprazole █████████████████████████████
      ████████████████;

8.    Hetero Drugs Limited, Hetero Labs Limited, and Hetero
      USA, Inc. **(collectively, "Hetero")** Civil Action No.
      15-161 (JBS/KMW), seek FDA approval to sell generic
      aripiprazole ███████████████████████████████████████
      ████████; and

9.    Sandoz Inc., Sandoz Private Ltd., and Sandoz
      International Gmbh. **(collectively, "Sandoz")**, Civil
      Action No. 15-1716 (JBS/KMW), seek FDA approval to
      sell generic aripiprazole ████████████████████████████
      ████████████████.

In support of its request for temporary restraining orders,

Otsuka claims that Defendants' generic aripiprazole tablets

and/or orally disintegrating tablets infringe Claim 1 of the

'350 Patent, a follow-on composition patent indicated for the treatment of major depressive disorder. (See generally Otsuka's Br. at 4-5; see also Ex. 4 to Fues Dec.)  Claim 1, however, discloses only a combination aripiprazole and escitalopram/citalopram product, and each of these Defendants seek approval for a generic product containing only aripiprazole. (See generally Ex. 4 to Fues Dec.)

Nevertheless, in relying upon Claim 1 in connection with its request for a temporary restraining order, Otsuka argues that Defendants' proposed generics will induce infringement of Claim 1 of the '350 patent, because Defendants' proposed package inserts or labels[2] amply "teach[] and encourage[]" the co-administration of aripiprazole with an antidepressant like citalopram and escitalopram for the treatment of major depressive disorder. (Otsuka's Reply at 4.)  In addition, Otsuka argues that the entry of Defendants' infringing generic aripiprazole products would result in the severe loss of Otsuka's market share, permanent and irreversible erosion of Abilify®'s price, and potentially a partial or complete cessation of Otsuka's Abilify®-oriented operations. (See generally Otsuka's Br. at 13-29; Otsuka's Reply at 3-12.)[3]

---

[2] The Court will refer to Defendants' "package inserts" and/or "labels" interchangeably.
[3] Otsuka filed individual briefs in each of these thirteen actions with pending motions.  Though the submissions contain,

These generic Defendants have mounted substantively identical oppositions to Otsuka's motions, and indeed argued their opposition collectively through designated counsel at the April 10, 2015 hearing.[4]  These Defendants, in particular, uniformly argue that Otsuka's infringement theory reads a critical element out of Claim 1, and ignores the fact that Claim 1's plain language purportedly covers only a single dosage form, i.e., a single drug product, containing aripiprazole in combination with escitalopram and/or citalopram.  (See, e.g., Actavis's Opp'n at 7; Teva's Opp'n at 10-12; Apotex's Opp'n at 4-8.)  As a result, because each Defendant seeks to market only an aripiprazole tablet, and not an aripiprazole tablet coupled with the additional active ingredients of escitalopram and/or citalopram, Defendants insist that Otsuka cannot, under any set of facts, prove a claim of induced infringement of its '350 patent as against any of them.  (See, e.g., Torrent's Opp'n at 2; Actavis's Opp'n at 19; Hetero's Opp'n at 8 n.10; Zydus's Opp'n at 19-20; Alembic's Opp'n at 9-13.)

---

in part, some argument tailored to a specific defendant, Otsuka's submissions remain substantively identical, and seek injunctive relief based upon the identical arguments in each case.

[4] Therefore, the Court will consider these Defendants' positions in unison, unless otherwise indicated.  Any argument with relevance to only one particular Defendant will, of course, be specifically indicated and addressed separately.

In addition, and in the alternative, Defendants argue that their respective package inserts deliberately "carved out" the basis for Otsuka's claim of induced infringement by omitting the treatment indication claimed by the '350 patent, and omitting instruction on the use of aripiprazole in conjunction with either citalopram or escitalopram, thereby negating the intent prerequisite for inducing infringement, and otherwise eliminating any active or implied instruction or encouragement of any infringing aripiprazole composition and/or use.

The primary issues before the Court concern whether Otsuka has demonstrated a likelihood of success on its claims of induced infringement, and whether Otsuka has demonstrated that it will, in the absence of an injunction, suffer irreparable harm as a result of these generic Defendants' entry into the aripiprazole market.

For the reasons that follow, Otsuka's motion for a temporary restraining order will be denied.

## II.  BACKGROUND

### A. Factual and Procedural Background

Otsuka, a pharmaceutical company organized and existing under the laws of Japan, holds New Drug Application (hereinafter, "NDA") No. 21-436, approved by the FDA, for aripiprazole tablets, which Otsuka markets under the trademark Abilify®.

In connection with Abilify's® listing in the Orange Book, the FDA's book of drug products approved under the Food, Drug, and Cosmetic Act (hereinafter, the "Orange Book"), 21 U.S.C. § 355(j), Otsuka identifies the '528 patent, the '092 patent, the '615 patent, the '796 patent, the '600 patent, the '760 patent, and the '350 patent, all of which Otsuka owns by virtue of assignment.

Prior litigation involving these and related generic defendants, and concerning the '528 patent covering the aripiprazole compound, compositions, and methods of treatment, resulted in a decision that, in effect, precludes any generic competition in aripiprazole market prior to the expiration of the '528 patent (inclusive of its pediatric exclusivity period) on April 20, 2015.  See generally Otsuka Pharm. Co. v. Sandoz, Inc., No. 07-1000 (MLC), 2010 WL 4596324, at *4-5 (D.N.J. Nov. 15, 2010).  As a result of this exclusivity, Otsuka has enjoyed an extended and incredibly lucrative monopoly over the aripiprazole market.

Moreover, in the aftermath of that decision (and indeed during the litigation), Otsuka sought and obtained FDA approval for an array of "follow on" patents, all of which generally concern the aripiprazole drug substance, and seek to elongate Otsuka's long-held monopoly over the aripiprazole market.  As relevant here, the '350 patent, a product patent which the FDA

14

issued on June 24, 2014, generally discloses a combination aripiprazole product comprised of aripiprazole together with serotonin reuptake inhibitors in a pharmaceutically acceptable carrier, for the "Adjunctive Treatment of Major Depressive Disorder."

As Otsuka's patent plateau approached, a flurry of generic Defendants, many if not all of which are implicated in these related patent infringement actions, filed ANDAs seeking approval to market an array of aripiprazole products.  As a result of the ANDA filings, Otsuka filed Complaints in this District, alleging that these Defendants proposed generic aripiprazole products will, if approved and marketed, infringe some combination of the follow on patents, e.g., at least one specific claim of the '615, '796, '760, '092, '600, and/or the '350 patents.

After nearly one year of litigation in certain cases, see, e.g., Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Civil Act. No. 14-1078 (filed March 18, 2014); Otsuka Pharma Co., Ltd. v. Alembic Pharm. Ltd., Civil Act. No. 14-2982 (filed May 9, 2014), and despite long knowing the April 20, 2015 date certain of the '528 patent's expiration, Otsuka first referenced its proposal in these related cases to file motions for temporary restraining orders and preliminary injunctions on March 9, 2015.

15

Faced with the prospect of such motions with regard to potential at-risk launches by as many as two-dozen Defendants on or after April 20, 2015, the Court promptly convened an in-person conference with all counsel in the related actions on March 16, 2015, in order to enter a global schedule for Otsuka's seemingly long-anticipated motions for preliminary injunctions.

During the conference, the nature of Otsuka's proposed motions came into focus. Critically, despite these related Defendants' ANDA filings, Otsuka did not know which, if any, of the generic defendants intended to launch generic aripiprazole products "at risk" at the expiration of the '528 patent's pediatric exclusivity on April 20, 2015, and therefore did not know against whom to seek injunctive relief. The Court, in turn, faced the prospect (for generic defendants not intending to launch at this time) of addressing motions without live controversies, but recognized the confidential and sensitive nature of these defendants' launch intentions. Therefore, following arguments of counsel, the Court entered a Scheduling Order on March 17, 2015, that observed the principle that the generic defendants would not be required to provide notice of intent to launch at risk, all while avoiding unnecessary adjudication by permitting defendants without intention to launch at risk to opt out of the briefing associated with

Otsuka's motion for temporary restraining order.  [See, e.g., Docket Item 76 in 14-1078.]

The Scheduling Order, in particular, permitted any defendant to file, in lieu of opposition to Otsuka's motion, a statement that such defendant did not intend to launch its aripiprazole product prior to June 20, 2015, in which case Otsuka's motion would be dismissed without prejudice to renewal, and that opt out defendant would be deemed precluded from launching prior to June 20, 2015, unless otherwise ordered by the Court.  [See id. at ¶ 2.]  In accordance with the Court's Scheduling Order, briefing followed in these cases.[5]

The Court heard arguments and proffers of evidence on behalf of all parties at the hearing upon these motions for temporary restraining order on April 10, 2015, in which the parties have amassed a record of thousands of pages spanning the 13 above-captioned dockets.[6]

---

[5] As stated above, generic defendants in ten related actions opted out of this motion practice.
[6] Indeed, the record developed in these Hatch-Waxman Act cases includes lengthy opening briefs, opposition briefs, reply briefs, and sur-replies, together with the fact and expert declarations and supplemental declarations of Aaron Deves, John C. Jarosz, Bryan L. Roth, M.D., Ph.D, Ira S. Halper, M.D., Anthony Palmieri III, Ph.D., R.Ph., Philip B. Nelson, Ph.D., S. Shane Konrad, M.D., Jeffrey Hampton, Robert J. Orr, Ph.D., Christopher A. Ross, M.D., Ph.D., Christopher H. Spadea, Gilbert Block, M.D., Ph.D., David Blackburn, Ph.D., Harinath Gangasani, Joseph R. Calabrese, M.D., and Sumanth Addanki, M.D.

## III. PRELIMINARY ISSUES

Prior to addressing Otsuka's motions for a temporary restraining order, the Court must address two threshold issues.

### A. Otsuka's Motions to Amend

First, Otsuka has very recently[7] moved to amend its Complaints in Otsuka Pharm. Co., Ltd. v. Torrent Pharm., Inc., Civil Action No. 14-4671 (JBS/KMW), Otsuka Pharm. Co., Ltd. v. Zydus Pham. USA Inc., Civil Action No. 14-3168 (JBS/KMW), Otsuka Pharm. Co., Ltd. v. Zydus Pham. USA Inc., Civil Action No. 14-7252 (JBS/KMW), Otsuka Pharm. Co., Ltd. v. Teva Pharm. USA, Inc., Civil Action No. 14-5878 (JBS/KMW), and Otsuka Pharm. Co., Ltd. v. Teva Pharm. USA, Inc., Civil Action No. 14-6398 (JBS/KMW), in order to assert the '350 patent, for the first time, against Torrent, Zydus, and Teva.[8]

Under Federal Rule of Civil Procedure 15, leave to amend should be "freely give[n] when justice so requires." FED. R. CIV. P. 15(a)(2). Therefore, in the absence of undue prejudice, unfair prejudice, or futility, motions to amend must be granted.

---

[7] These motions, filed on March 19, 2015, were a surprise because Otsuka had made no mention of its intent to amend to assert the '350 patent against these parties just three days before at the conference of March 16, 2015, which the Court called specifically to plan for this injunctive motion practice.
[8] Similar motions were brought against Mylan, Inc., Zhejiang Huahai Pharmaceutical Co., Ltd., and Ajanta Pharma Limited, which were unopposed by those parties, and Otsuka has, as a result, filed the amended pleading in those respective cases.

See Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006)
(stating that generally, leave to amend should be granted
"unless equitable considerations render it otherwise unjust.").

Torrent, Zydus, and Teva, challenge Otsuka's motions to
amend on futility, prejudice, and delay grounds. (See Torrent's
Opp'n to Mot. to Amend at 2-5; Zydus's Opp'n to Mot. to Amend at
6-13; Teva's Opp'n to Mot. to Amend at 6-19.)  The Court,
however, finds that Otsuka's proposed amendments provide
sufficient factual matter, if accepted as true, to state
plausible, non-futile claims for relief.  See Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009).  The Court is reluctant to conclude in
expedited motion practice on these amendments that Otsuka could
never prevail on such claims under its '350 patent.  There is
further the practical consideration that the contours of the
'350 patent and the defendants' products are being explored in
detail in those other closely related cases, with the benefit of
an elaborate record.

In addition, the Court does not find that Otsuka unduly
delayed in seeking to amend, nor that its motions have caused
unfair prejudice to these Defendants in connection with Otsuka's
motions for temporary restraining orders.  Delay was not undue
in these cases because Otsuka had asserted the '350 patent,
among others, against all ANDA-filers in the many companion
cases which had filed Paragraph IV certifications under 21

19

U.S.C. § 355(j)(2)(A)(vii), asserting their positions that their ANDAs would not infringe the patents at issue, and/or their position on the invalidity of the patents at issue.[9]  Otsuka claims it did not initially assert the '350 patent against these remaining ANDA filers because they had instead filed section viii statements under 21 U.S.C. § 355(j)(2)(A)(viii), certifying that they only intended to offer an aripiprazole product, and had not requested approval for any patented indications, particularly any approval related to the combination of aripiprazole with antidepressants citalopram and/or escitalopram.  Otsuka claims that it asked for clarification from these section viii filers of exactly what their product and labels/package inserts would entail, and that Otsuka never received the desired clarifications thus prompting the need to

---

[9] See Otsuka Pharma. Co., Ltd. v. Sun Pharma. Indus., Ltd., Civil Action No. 14-6397 (JBS/KMW) (filed October 6, 2014); Otsuka Pharma. Co., Ltd. v. Aurobindo Pharma Ltd., Civil Action No. 14-6890 (JBS/KMW) (filed October 31, 2014); Otsuka Pharma. Co., Ltd. v. Lupin Ltd., Civil Action No. 14-7105 (JBS/KMW) (filed November 3, 2014); Otsuka Pharma. Co., Ltd. v. Actavis Elizabeth LLC, Civil Action No. 14-7106 (JBS/KMW) (filed November 10, 2014); Otsuka Pharma. Co., Ltd. v. Alembic Pharma., Ltd., Civil Action No. 14-7405 (JBS/KMW) (filed November 26, 2014); Otsuka Pharma. Co., Ltd. v. Apotex Corp., Civil Action No. 14-8074 (JBS/KMW) (filed December 24, 2015); Otsuka Pharma. Co., Ltd. v. Hetero Drugs, Ltd., Civil Action No. 15-161 (JBS/KMW) (filed January 8, 2015); Otsuka Pharma. Co., Ltd. v. Amneal Pharma. Co, Ltd., Civil Action No. 15-1585 (JBS/KMW) (filed March 2, 2015); Otsuka Pharma. Co., Ltd. v. Sandoz Inc., Civil Action No. 15-1716 (JBS/KMW) (filed March 9, 2015); Otsuka Pharma. Co., Ltd. v. Indoco Remedies Ltd., Civil Action No. 15-1967 (JBS/KMW) (filed March 17, 2015)

assert the '350 patent against them in these motions to amend.
By holding their cards so close to the vest as litigation
progressed, these defendants contributed to Otsuka's delay in
joining the '350 patent to this litigation.

With respect to prejudice, the Court notes that, despite
the short notice, these Defendants have shown the ability to
address these claims through their filing of oppositions and
sur-replies equivalent and substantively identical to those of
the generic defendants against whom Otsuka asserted the '350
patent far earlier.  Given this, it can fairly be concluded that
these parties anticipated that the '350 patent would be in play
just as it was in the related cases.

Consequently, for the reasons stated above and on the oral
argument record on April 10, 2015, Otsuka's motions to amend
will be granted.

**B. Informal Applications to Strike**

Second, the Court addresses Defendants' application to
strike the supplemental declarations of Otsuka's experts, Dr.
Roth and Mr. Jarosz [see, e.g., Docket Item 103 in 14-1078],[10]
and Otsuka's application to strike Defendants' "improperly"
raised claim construction arguments.  [See, e.g., Docket Item

---

[10] Counsel for Alembic moved to strike Otsuka's supplemental
declarations on behalf of all Defendants by letter dated April
8, 2015.

104 in 14-1078.]  Defendants, in particular, challenge Otsuka's
supplemental declarations to the extent Dr. Roth's and Mr.
Jarsoz's supplemental declarations present new factual and legal
arguments concerning claim construction, patent validity, and
the financial harm to Otsuka in the absence of an injunction.
[See, e.g., Docket Item 103 in 14-1078.]  Otsuka, in turn, seeks
to strike Defendants' sur-replies and accompanying supplemental
declarations, principally to the extent Defendants' sur-replies'
"distort[] and misrepresent[] the prosecution history" of the
'350 patent.  [See, e.g., Docket Item 104 in 14-1078.]

    In that respect, both applications concern, at their cores,
the purportedly improper expansion of the factual record on
substantive issues implicated in Otsuka's pending motions.
Nevertheless, the Court finds that all issues relevant to
Otsuka's pending motions for temporary restraining orders,
including, all issues with respect to claim construction,
invalidity, and irreparable harm, have been amply dealt with in
the parties' voluminous submissions, and through counsels'
lengthy presentations at the April 10, 2015 hearing.  Indeed,
counsels' comprehensive oral arguments mitigated any arguable
prejudice associated with the new assertions in supplemental
declarations and/or sur-replies.[11]  The Court will, however,

---

[11] On the oral argument record, counsel for Apotex argued that
Otsuka's supplemental declarations prejudiced the record (here

strike Otsuka's supplemental declarations to the extent the
experts, in their declarations, set forth their own legal
conclusions (as opposed to a reiteration of a legal conclusion).
See L. CIV. R. 7.2(a) ("Legal arguments and summation in
[affidavits, declarations, and certifications] will be
disregarded by the Court and may subject the signatory to
appropriate censure, sanctions or both.").

For these reasons, and those set forth during the April 10,
2015 hearing, Defendants' application to strike will be granted
in part only with respect to certain legal arguments of Otsuka's
experts and denied with respect to Defendants' remaining
challenges, and Otsuka's application to strike will be denied in
its entirety.

---

and potentially on appeal), by enabling Otsuka to cure an
initial deficiency in Otsuka's opening submission, namely, the
alleged lack of argument on claim construction.  As stated
below, Otsuka's opening submission gave little attention to
claim construction.  Nevertheless, the Court does not find any
prejudice to the record.  Indeed, given the substantive nature
of the issues presented in Otsuka's motions for temporary
restraining orders, there could be little mystery about the need
for claim construction and, in that respect, the only new aspect
of Otsuka's supplemental declarations concerned the fact that
Otsuka did indeed have an expert on claim construction.  Given
the volume of expert opinions, these Defendants cannot be heard
to claim any surprise in the late introduction of certain,
limited expert opinion.

Therefore, the Court turns to the merits of Otsuka's motions for temporary restraining orders to prohibit at-risk launches by these generic product defendants.

**IV. STANDARD OF REVIEW APPLICABLE TO MOTIONS FOR TEMPORARY RESTRAINING ORDER**

"The decision to grant or deny ... injunctive relief is an act of equitable discretion by the district court." eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); see also 35 U.S.C. § 283 (generally providing that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable"). Injunctive relief, however, remains "'an extraordinary remedy never awarded as of right.'" Wind Tower Trade Coalition v. United States, 741 F.3d 89, 95 (Fed. Cir. 2014) (citations omitted).

A party seeking a temporary or preliminary injunction must therefore demonstrate: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm in the absence of an injunction; (3) that this harm would exceed harm to the opposing party; and (4) that the public interest favors such relief. See, e.g., Sciele Pharma Inc. v. Lupin Ltd., 684 F.3d 1253, 1259 (Fed. Cir. 2011); Antares Pharma, Inc. v. Medac Pharma, Inc., No. 14-270, 2014 WL 3374614, at *2 (D. Del. July 10, 2014). These considerations apply equally to requests for

24

temporary restraining orders and preliminary injunctions.  See
Takeda Pharm. USA, Inc. v. West-War Pharm. Corp., No. 14-1268,
2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014) ("A request for a
TRO is governed by the same general standards that govern the
issuance of a preliminary injunction.") (citation omitted).

In determining whether to issue injunctive relief, no one
factor, taken individually, proves dispositive.  See Hybritech
v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988); see also
AstraZeneca LP v. Apotex, Inc., 623 F. Supp. 2d 579, 587 (D.N.J.
2009).  Rather, the Court "must weigh and measure each factor
against the other factors and against the form and magnitude of
the relief requested."  Hybritech, 849 F.2d at 1451.
Nevertheless, no injunction will issue, temporary or otherwise,
unless the movant "'establishes both of the first two factors,
i.e., likelihood of success on the merits and irreparable
harm.'"  PHG Tech., LLC v. St. John Cos., Inc., 469 F.3d 1361,
1365 (Fed. Cir. 2006) (quoting Amazon.com, Inc. v.
Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)).

The Court will address each of the four factors in turn.

**V.  DISCUSSION**

**A. Likelihood of Success**

Otsuka claims that nine groups of generic Defendants in
these 13 cases should be enjoined from launching their
aripiprazole products on or after April 20, 2015 because their

25

aripiprazole products will infringe Claim 1 of the '350 patent,
the only patent asserted in these preliminary injunction
motions.

In order to establish a likelihood of success on the
merits, the "patentee seeking a preliminary injunction in a
patent infringement suit must show that it will likely prove
infringement, and that it will likely withstand challenges, if
any, to the validity of the patent." Titan Tire v. Case New
Holland, 566 F.3d 1372, 1376 (Fed. Cir. 2009).

As relevant here, Otsuka must demonstrate that, "in light
of the presumptions and burdens that will inhere at trial on the
merits," it will likely prove that these generic Defendants'
aripiprazole products infringe the '350 patent and that Otsuka
will withstand these generic Defendants' challenges to the
validity of the '350 patent. Sciele Pharma Inc., 684 F.3d at
1259. If, however, these generic Defendants raise "substantial
question[s] concerning either infringement or validity, i.e.,
assert[] an infringement or invalidity defense[s] that [Otsuka]
cannot prove 'lack[] substantial merit,' the preliminary
injunction should not issue." Amazon.com, Inc., 239 F.3d at
1350-51 (citation omitted); see also Trebro Mfg., Inc. v.
Firefly Equipment, LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014)
(same).

Here, the Court will first address the issue of
infringement, prior to turning to invalidity.

### 1. Otsuka Has Not Demonstrated a Likelihood of Success on its Induced Infringement Claims

For purposes of these requests for injunction relief,
Otsuka argues that it will likely prevail at trial on its
position that all of Defendants' labels induce infringement of
Claim 1 of the '350 patent.[12]  (Otsuka's Reply at 1-2.)  Otsuka,
in particular, insists that Defendants' inserts unquestionably
instruct physicians "to prescribe aripiprazole in combination
with an antidepressant like citalopram and escitalopram" and
provide "information" concerning "issues to consider" when
prescribing such a combination.  (Otsuka's Reply at 4-5.)  In so
arguing, Otsuka recognizes that these Defendants' proposed
labels have "carved out" the indication covered by the '350
patent, i.e., the use of aripiprazole for the adjunctive
treatment of major depressive disorder, that Defendants' labels

---

[12] In these actions, Otsuka claims that Defendants' generic
aripiprazole tablets infringe one or more claims of the '615,
'796, '760, '600, and/or the '350 patents.  Nevertheless,
according to Otsuka, because the infringement issues related to
the '615, '796, '760, and/or the '600 patents "raise complex
technical issues that may require expert analysis" and implicate
"ongoing" discovery, Otsuka solely relies upon "infringement
issues" associated with the '350 patent in support of its
request for preliminary injunctive relief.  (Otsuka's Br. at 2.)
This Opinion will therefore make no further reference to the
'615, '796, '760, and the '600 patents, because only the '350
patent is in play.

27

do not <u>specifically</u> direct or prescribe the adjunctive administration of aripiprazole with escitalopram and/or citalopram, and that none of the labels contain any reference to citalopram.  (<u>See</u> <u>generally</u> Otsuka's Reply at 10-12, 15-17.)

Nevertheless, based upon certain warning and safety information concerning the coadministration of aripiprazole with antidepressants, particularly in the Defendants' various "'black box' warning[s]," Otsuka submits that each label implicitly teaches and encourages the beneficial nature of coadministering aripiprazole in the manner protected by the '350 patent. (Otsuka's Br. at 11, 15-17; Otsuka's Reply at 4-6; <u>see</u> <u>also</u> Roth Dec.)  As a result, Otsuka asserts that Defendants' package inserts induce infringement of Claim 1 of the '350 patent, because Claim 1 purportedly "discloses and claims novel pharmaceutical compositions comprising aripiprazole in combination with <u>serotonin reuptake inhibitors</u>" (as opposed to only escitalopram and/or citalopram), and "encompasses any use of that composition," particularly the use of the composition "as an adjunctive therapy for major depressive disorder." (Otsuka's Br. at 4-5 (emphasis added).)

These Defendants, however, uniformly counter that Otsuka's inducement claim fails, even at this preliminary stage, and would ultimately fail at a trial on the merits, for at least two reasons.

First, Defendants claim that Otsuka's infringement claim lacks merit, because Defendants' ANDA products seek only to market aripiprazole, without any accompanying ingredient. Therefore, because no Defendant seeks to market and/or distribute a "pharmaceutical composition" comprised of aripiprazole and citalopram and/or escitalopram, Defendants argue that they will not make, use, offer for sale or sell a product within the scope of Claim 1 (See, e.g., Actavis's Opp'n at 6; Sun's Opp'n at 9-10; Sandoz's Opp'n at 1, 15; Hetero's Opp'n at 8 n.10; Apotex's Opp'n at 8-9), and, as a result, could never directly infringe the '350 patent, a threshold requirement for a finding of inducement. (See, e.g., Alembic's Opp'n at 10-13; Torrent's Opp'n at 8-10; Zydus's Opp'n at 19-21; Sandoz's Sur-reply at 1-3.) Second, Defendants argue that Otsuka has failed to demonstrate that their package inserts or prescribing information reflect the requisite specific intent to induce infringement. (See, e.g., Actavis's Opp'n at 13-18; Hetero's Sur-reply at 2-4.)

In order to properly frame the issues implicated by the pending motions—namely, the parties' disputes concerning whether Otsuka sufficiently demonstrated the threshold elements of an induced infringement claim-the Court must briefly discuss the relevant framework.

### a. Standard for Induced Infringement

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b) (emphasis added). In order to establish inducement, the patentee must show "direct infringement, and that the alleged infringer 'knowingly induced infringement and possessed specific intent to encourage another's infringement.' " i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 851 (Fed. Cir. 2010).  In other words, Otsuka's theory of induced infringement will be viable "if, but only if," Otsuka demonstrates "direct infringement," Limelight Networks, Inc. v. Akamai Techs., Inc., 134 S. Ct. 2111, 2117 (2014) (citation omitted), and if Otsuka presents affirmative evidence that any Defendant knowingly induced infringing acts and possessed a specific intent to encourage another to infringe the '350 patent.  See Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1328 (Fed. Cir. 2009); Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1364 (Fed. Cir. 2003).  In that regard, induced infringement premises liability upon "purposeful, culpable expressions and conduct" and "active steps" taken to encourage direct infringement, including advertising and/or instructions. DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1305-1306 (Fed. Cir. 2006) (en banc in relevant part).

As relevant here, in order to obtain a preliminary injunction, Otsuka must prove that it will "'more likely than

not'" succeed in establishing the elements of induced infringement.  <u>Trebro Mfg., Inc.</u>, 748 F.3d at 1166 (citation omitted). Given the parties' dispute, the infringement analysis for purposes of the pending motion requires two steps.  <u>See Abbott Labs. v. Sandoz, Inc.</u>, 566 F.3d 1282, 1288 (Fed. Cir. 2009).  First, the Court must construe the disputed claim of the '350 patent, in order to determine the scope of the claimed infringement.  Second, the Court must compare the generic Defendants' proposed product with the relevant portion of the construed '350 patent.  <u>Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.</u>, 234 F. Supp. 2d 464 (D. Del. 2002) (conducting the two-part inquiry), <u>aff'd</u>, 363 F.3d 1306 (Fed. Cir. 2004).  The Court will address each step in turn.

> **i. Claim Construction: Claim 1 of the '350 Patent Discloses a Composition, Namely a Tablet, Comprised of a Single Dosage that Contains At Least Two Active Ingredients**

In its submissions, Otsuka makes little mention of the need to construe Claim 1 of the '350 patent.[13]  (<u>See</u> Otsuka's Br. at

---

[13] Indeed, in its opening briefs, Otsuka sets forth no discussion of the standard applicable to claim construction (<u>see</u> <u>generally</u> Otsuka's Br. at 4-5), and only cursorily introduces one self-serving portion of the claim construction standard in its reply briefings.  (<u>See</u> Otsuka's Reply at 4 (asserting that "a court should give a claim term the full range of its ordinary meaning as understood by a person of ordinary skill in the art") (citing <u>Rexnord Corp v. Laitram Corp.</u>, 274 F.3d 1336, 1342 (Fed. Cir. 2001).)  Otsuka has presented expert testimony of Dr. Roth, in his supplemental declaration, regarding Otsuka's proposed

31

4-5, 10.)  Rather, Otsuka asserts, without explanation, that
Claim 1 of the '350 patent discloses "novel pharmaceutical
compositions comprising aripiprazole in combination with
serotonin reuptake inhibitors," and argues that, despite the
claim language, the <u>specification</u> of the '350 patent clarifies
the "understanding that the claimed pharmaceutical composition"
claim broadly discloses "<u>multiple</u> dosage forms," and that
aripiprazole and the relevant serotonin reuptake inhibitors
"need not be present in the same pill or dosage form."  (<u>Id.</u> at
4-5; <u>see also</u> Otsuka's Reply at 3-4 (arguing that, "the
specification unambiguously explains that aripiprazole and at
least one SRI may be in the same dosage form or in separate
dosage forms").)

     These generic Defendants, however, uniformly characterize
Otsuka's proposed construction as untenably broad, and argue,
based upon the plain claim language, that Claim 1 should be
construed to require a <u>single</u> pharmaceutical composition or
dosage form, i.e., a single tablet, comprised of at least two
different active ingredients: (a) aripiprazole and (b) either
citalopram or escitalopram.  (<u>See, e.g.</u>, Apotex's Opp'n at 6;
Sandoz's Opp'n at 7-15; Teva's Br. at 10-12; Hetero's Br. at 9-
17; Actavis's Opp'n at 7-9.)

────────────────────

construction of Claim 1 for purposes of this motion, which the
Court has considered.  (<u>See</u> Roth Supplemental Dec. at ¶¶ 12-17.)

In construing claim terms, courts "look to, and primarily rely on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent."[14] <u>Sunovion Pharm., Inc.</u>, 731 F.3d at 1276. Generally, however, claim terms are "given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history."[15] <u>Golden</u>

---

[14] The construction of claim terms constitutes a question of law, <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370 (1996), and the Court need not follow the parties' proposed constructions. <u>See</u> <u>Marine Polymer Techs., Inc. v. HemCon, Inc.</u>, 672 F.3d 1350, 1359 n.4 (Fed. Cir. 2012) (en banc).

[15] The parties all proffer expert opinion concerning the proper construction of Claim 1. (<u>See, e.g.</u>, Roth Dec. at ¶¶ 13-17 (Otsuka's psychopharmacology expert); Palmieri Dec. at ¶¶ 24-55 (Alembic's, Zydus's, Sun's, Teva's, Apotex's, and Hetero's pharmaceutical formulator expert).) Nevertheless, because the intrinsic evidence, namely, the plain claim language, discloses the meaning of the disputed claim, the Court need not examine any extrinsic evidence, including expert testimony. <u>Phillips</u>, 415 F.3d at 1318 (explaining that courts need only resort to extrinsic evidence, in the event that the intrinsic evidence fails to disclose the relevant meaning of the disputed claim(s) and/or term(s)). Nevertheless, the Court notes that Otsuka's expert, Dr. Roth, asserted his opinion "that the 'pharmaceutical composition' described in claim 1 of the '350 patent includes situations where aripiprazole and citalopram/escitalopram (and salts thereof) appear in the same dosage form and also in circumstances wherein aripiprazole and citalopram/escitalopram (and salts thereof) appear in two or more dosage forms." (Roth Supplemental Dec. at ¶ 13.) In rendering this opinion, however, Dr. Roth relied exclusively upon the sections of the specification summarized below, and provided no discussion of the plain claim language, nor attempted to reconcile his opinion with the plain claim language. (<u>See</u> <u>id.</u> at ¶¶ 12-17.) Therefore, even if the Court reached Otsuka's expert opinion on claim construction, which it need not given Claim 1's use of commonly understood words, the Court finds Dr. Roth's claim construction

_Bridge Tech., Inc. v. Apple Inc._, 758 F.3d 1362, 1365 (Fed. Cir.
2014) (citing _Phillips v. AWH Corp._, 415 F.3d 1303, 1315–17
(Fed. Cir. 2005) (en banc)).  Nevertheless, "'[t]he construction
that stays true to the claim language and most naturally aligns
with the patent's description of the invention will be, in the
end, the correct construction.'" _Shire Dev., LLC v. Watson
Pharms., Inc._, 746 F.3d 1326, 1330 (Fed. Cir. 2014) (quoting
_Phillips_, 415 F.3d at 1316).

     The disputed composition claim in this instance, Claim 1 of
the '350 patent, requires no complex construction.  Indeed, the
limited claim language leaves little to the imagination, and
requires no more than "the application of the widely accepted
meaning of commonly understood words."[16]  _Phillips_, 415 F.3d at
1314.

     Claim 1 of the '350 patent specifically discloses, in its
entirety, as follows: "**A pharmaceutical composition comprising**

---

opinion of little weight.  Moreover, in reaching opposite
conclusions, Defendants' experts, by contrast, began, as they
must, with the plain and ordinary meaning of Claim 1.  (See,
e.g., Palmieri Dec. at ¶¶ 21-26; Halper Dec. at ¶¶ 28-29; Orr
Dec. at ¶¶ 13-16; Ross Dec. at ¶¶ 20-23.)
[16] Indeed, Otsuka conceded in at least four of these related
actions that phrases "a/the pharmaceutical composition" and "in
combination with" should be construed in accordance with the
phrases' "plain and ordinary meaning as understood by a person
of ordinary skill in the art."  (Ex. 11 to Tang Dec.)  For that
reason, the Court rejects Otsuka's suggestion on the April 10,
2015 oral argument record that Claim 1 arguably possesses any
special definition.

**(a) aripiprazole in combination with (b) at least one serotonin reuptake inhibitor selected from citalopram, escitalopram and salts thereof.**"  ('350 patent, reprinted at Ex. 4 to Fues Dec. at col. 28, ln. 64-67 (emphases added).)  In that regard, Claim 1 discloses, on its face, only a composition product comprised of the identified active pharmaceutical ingredients, but not any method of administration, particular molecular structure, nor any method of use.

Moreover, despite the brevity of the claim language, several features critically relevant to construction immediately emerge from even an cursory review of Claim 1's brief language, namely, the inclusion of "a pharmaceutical composition" in the singular, followed by grammatically uninterrupted identification of the composition's at least two component parts.  (Id. (emphasis added).) See Credle v. Bond, 25 F.3d 1566, 1571 (Fed. Cir. 1994) (stating that "grammatical structure and syntax" of the claim can be important evidence for claim construction). Taken together, the phrases "a pharmaceutical composition" and "in combination with," when followed by a lettered delineation of the required parts (Ex. 4 to Fues Dec. at col. 28, ln. 64-67 (emphasis added)), provide a clear indication that the claim refers to a single pharmaceutical composition or dosage comprised of multiple active pharmaceutical ingredients. Indeed, given the grammatical structure and use of commonly

35

understood terms, a lay person would immediately understand that
"[a] pharmaceutical composition" comprised of "(a)" and "(b)"
means that the claimed "composition" requires a single dosage of
the identified ingredients—specifically, aripiprazole as the
first ingredient, and citalopram, escitalopram and salts
therefore as the second ingredient.  (Ex. 4 to Fues Dec. at col.
28, ln. 64-67.)  A plain reading of the Claim language permits
no broadened interpretation.[17]

    Moreover, the Court's commonsense, plain language
construction finds further support in dependent Claim 18, which
discloses "[t]he composition of Claim 1, wherein the amount of
(a) aripiprazole in combination with (b) at least one serotonin
reuptake inhibitor selected from citalopram, escitalopram and
salts thereof is 1 to 70 parts by weight of the total
composition." ('350 patent at col. 30, ln 44-48 (emphasis
added).)  Claim 18 therefore describes the single
"pharmaceutical composition" of Claim 1 in terms of the combined

---

[17] In arguing for a construction with greater breadth, Otsuka
implicitly acknowledges that its proposed construction finds
little support in the plain claim language (see Otsuka's Br. at
4 (arguing that Claim 1 of the '350 patent "is directed
generally to a pharmaceutical composition," and then quickly
turning to the specification)), and entirely ignores the "in
combination with" language. (See Otsuka's Reply at 3; see also
Roth Supplemental Dec. at ¶¶ 12-15 (suggesting, based upon the
specification, that the composition disclosed by Claim 1 could,
in certain "circumstances," appear in two or more dosage
forms).)

36

weight of its active ingredients formulated together in a "total composition." (Id. (emphases added).)  By claiming a specific weight ratio (i.e., "1 to 70 parts"), dependent Claim 18 recites subject matter admittedly narrower than Claim 1.  Nevertheless, the Claims' consistent language makes clear that both disclose aripiprazole and citalopram or escitalopram formulated together in a single dosage form, even if at slightly varied weights. Indeed, Claim 18's disclosure of a specific ingredient ratio explicitly teaches that Claim 1's "pharmaceutical composition" necessarily occurs in a single dosage format.  See, e.g., Research Plastics, Inc. v. Fed. Packaging Corp., 421 F.3d 1290, 1295 (Fed. Cir. 2005) ("[C]laim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims."); see also Phillips, 415 F.3d at 1314 (noting that "the use of a term within the claim [can] provide a firm basis for construing the term").

The overall structure of the patent, throughout its various sequential components, then consistently and repeatedly teaches that the claimed invention concerns a single dosage form, comprised of two active ingredients.

Indeed, the '350 patent describes the invention at the outset in its abstract as a "pharmaceutical composition" comprised of "(1) a carbostyril derivative," either

"aripiprazole or a metabolite," together with "(2) a serotonin reuptake inhibitor," e.g., citalopram and/or escitalopram, "in a [single] pharmaceutically acceptable carrier." (See Ex. 4 to Fues Dec. at Abstract (emphasis added).)  In the disclosure of the invention, the '350 patent then reiterates that the claimed invention consists of at least two ingredients "in a pharmaceutically acceptable carrier." (Id. at col. 2, ln. 66 to col. 6, ln. 17.)

Identical disclosures appear in the Detailed Description, which describes in detail the "first" and "second" ingredients, "contained," "combined," or "mixed" in the single "pharmaceutical composition." (See, e.g., id. at col. 6, ln. 47-55; col. 10, ln. 52-57; col. 11, ln. 47-48 ("Combination of the First Ingredient with the Second Ingredient"); col. 13, ln. 56-62 ("the amounts of the first ingredient and the second ingredient to be contained in the pharmaceutical composition of the present invention..."); col. 20, ln. 27-41 (describing aripiprazole in a combined administration with citalopram and/or escitalopram).)  Indeed, the introduction of the Detailed Description states that, "[t]he pharmaceutical composition of the present invention comprises a first ingredient comprising a carbostyil derivative active as a dopamine-serotonin system stabilizer and a second ingredient comprising a serotonin reuptake inhibitor, in a pharmaceutically acceptable carrier."

38

(Id. at col. 6, ln. 47-51 (emphasis added).)  In that regard,
the syntax of the introduction alone indicates that the single
"pharmaceutically acceptable carrier" describes and limits the
preceding composition to a carrier, or dosage, comprised of two
ingredients.  Even more, however, the Detailed Description
contains the following illustrative subheadings: "The
Pharmaceutical Composition: The First Ingredient," i.e.,
aripiprazole, "The Pharmaceutical Composition: The Second
Ingredient," i.e., a serotonin reuptake inhibitor, and
"Combination of the First Ingredient with the Second
Ingredient," i.e., a combination of aripiprazole and an SRI, and
preferably "a combination of aripiprazole/citalopram." (Id. at
col. 6, ln. 56, col. 10, ln. 52, col. 11, ln. 47-59.) Imbedded
within these six columns, the Patent uniformly treats the
claimed invention as a single "combination" dosage, and
specifically delineates the preferred weight ratio "of the first
ingredient to the second ingredient" as generally, "about 1 to
70 parts by weight, preferably about 1 to 30 parts by weight of
the first ingredient and the second ingredient in the total
amount on the basis of the pharmaceutical composition." (See
id. at col. 11, 58-59, col. 12, ln. 61-63, col. 13, ln. 59-61.)

    The eighteen "non-limiting formulation examples of
aripiprazole" then uniformly disclose formulations for "the
[claimed] tablet" that contain multiple active pharmaceutical

ingredients, namely aripiprazole combined with at least one SRI, together in a single "tablet."   (Id. at Col. 20, ln. 46 – Col. 25, ln. 17 (emphases added); see also Col. 11, ln. 54-58 (setting forth a non-exhaustive list of the relevant SRIs).)

Given the volume and pervasiveness of these consistent references to a composition in a single dosage form, the Court finds no support for Otsuka's position that the "pharmaceutical composition" of Claim 1 should be construed, for purposes of the pending motions, to teach that aripiprazole and the at least one SRI (namely, escitalopram and/or citalopram) may be presented in separate and/or multiple dosage forms.  (See Otsuka's Br. at 4; Otsuka's Reply at 3.)

Nor does Otsuka's citation to limited portions of the specification support any contrary construction.  At the outset, the Court notes that Otsuka cannot cherry pick portions of the specification to support its argument that the '350 patent teaches a broadened definition of Claim 1's "pharmaceutical composition," all while ignoring the actual wording of Claim 1 and the other and numerous portions of the specification that provide a clear contrary indication that better comports with the plain claim language.  Moreover, when viewed in context, the relied-upon passages lend additional support to the position that Claim 1 refers to a single composition or tablet comprised of two active ingredients.

Otsuka, in particular, relies upon the following portions of the specification:

> The novel compositions of [the] present invention comprising at least one carbostyril derivative ... and at least one serotonin reuptake inhibitor in a pharmaceutically acceptable carrier <u>may be combined in one dosage form</u>, for example a pill. Alternatively the at least one carbostyril derivative ... and the at least one serotonin reuptake inhibitor <u>may be in separate dosage forms</u>, each in a pharmaceutically acceptable carrier.

(<u>Id.</u> at col. 3, ln. 52-60 (emphases added).)

> Administration forms of the pharmaceutical composition of the present invention may be any type by which the effective levels of both carbostyril derivatives and serotonin reuptake inhibitors can be provided in vivo at the same time. <u>In one embodiment</u>, a carbostyril derivative together with a serotonin reuptake inhibitor are contained <u>in one pharmaceutical composition</u> and this composition may be administered. <u>On the other hand</u>, each one of carbostyril derivative and a serotonin reuptake inhibitor are contained <u>individually in a pharmaceutical preparation respectively</u>, and each one of these preparations may be administered at the same time or in suitable intervals.

(<u>Id.</u> at col. 14, ln. 17-21 (emphases added).)

> <u>The aripiprazole can be administered in one dosage form</u>, for example a tablet, <u>and the serotonin reuptake inhibitor may be administered in a separate one dosage form</u>, for example a tablet. The administration may occur at about the same time or at different times during the day.
>
> <u>Alternatively, a dosage form containing aripiprazole in combination with at least one serotonin reuptake inhibitor may be administered</u>. Such combinations include without limitation the following: aripiprazole/fluoxetine, aripiprazole/duloxetine, aripiprazole/venlafaxine, aripiprazole/milnacipran, aripiprazole/citalopram, aripiprazole/fluvoxamine, aripiprazole/paroxetine, and aripiprazole/sertraline.

> A preferred embodiment comprises a combination of
> aripiprazole and citalopram.

(Id. at col. 26, ln. 15-20 (emphases added).)

These passages, particularly the emphasized portions, make plain a distinction between the preferred "combined" composition, e.g., the composition otherwise disclosed in the remainder of the specification, and an alternative composition in which the aripiprazole and the at least one SRI exists "in separate dosage forms, each in a pharmaceutically acceptable carrier." (Id.) Beyond recognizing this critical distinction, these passages further reflect the patent drafter's appreciation of the language necessary to disclose the potential for separate or multiple administrations. Nevertheless, the patent drafter included no sufficiently flexible or broad language in Claim 1 or in the "Detailed Description," choosing instead to refer to the singular claim term "pharmaceutical composition." In that respect, these passages appear to disclose, at most, "alternative" or "on the other hand" embodiments. The Court, however, need not credit alternatively disclosed embodiments that, as here, "contradict" the relevant claim language. TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1373 (Fed. Cir. 2008) (declining to include alternatively disclosed embodiment because it "would contradict the language of the claims"); Rolls- Royce, PLC v. United Techs. Corp., 603 F.3d 1325, 1334-35 (Fed. Cir. 2010) (omitting certain disclosed

42

embodiments to avoid a construction that "outweighs the language
of the claim."). Moreover, even if the Court otherwise accepted
Otsuka's interpretation of these specific portions of the
specification, the specification itself cannot be "a substitute
for, nor can [it] be used to rewrite, the chosen claim
language." SuperGuide Corp. v. DirectTV Enters., Inc., 358 F.3d
870, 875 (Fed. Cir. 2004) ("[s]pecifications teach," "[c]laims
claim").

    As stated above, the amount of intrinsic evidence that
consistently discloses that Claim 1 refers to a single dosage
form can hardly be described as anything less than substantial,
and the Court finds Otsuka's broadened construction without
support in the Claim language.[18]  For all of these reasons, the
Court construes Claim 1 for the purposes of the pending motion

_____

[18] Otsuka's new argument concerning Claim 9, which Otsuka raised
for the first time in its reply briefings and supplemental
declarations, requires no different conclusion. (See Roth
Supplemental Dec. at ¶ 17.) Otsuka, in particular, argues that
Claim 9 supports its position that Claim 1 "can be in one or
more dosage forms," to the extent Claim 9 discloses "a 'method
of treating a mood disorder ... comprising administration of an
effective amount of a pharmaceutical composition which
comprise(s) aripiprazole in combination [with] (b) at least one
serotonin reuptake inhibitor.'" (Roth Supplemental Dec. at ¶ 17
(citation omitted).) Nevertheless, the Court finds this new
position unconvincing for two reasons. Critically, Claim 9
constitutes an independent claim, thereby diminishing its
relevance to the interpretation of Claim 1. (See Ex. 4 to Fues
Dec. at Col. 9, ln. 26-40.) Second, and relatedly, Claim 9
discloses a "method of treatment," while Claim 1 concerns, on
its face, only a pharmaceutical composition. (Compare id. at
col. 28, ln. 64-67, with id. at col. 29, ln. 26-40.)

to refer to **a single dosage form, or "pharmaceutical composition," containing at least two active ingredients: (a) aripiprazole and (b) at least one of citalopram, escitalopram and salt thereof**.[19]  The Court turns to whether this construed Claim preliminarily supports Otsuka's infringement claims.

> **ii.    Otsuka Has Not Demonstrated That Defendants' Proposed ANDA Products Directly Infringe Construed Claim 1 of the '350 Patent**

A claim of induced infringement requires Otsuka, as stated above, to make a threshold showing of direct infringement— through either evidence "of specific instances of direct infringement" or through evidence "that the accused products

---

[19] The Court's construction also finds support in the weight of authority that has construed the term "pharmaceutical composition," and consistently concluded that this term of art refers to a single, aggregated product.  See, e.g., Ortho-McNeil Pharm. v. Kali Labs., No. 06-3533, 2008 WL 1782283, at *3-4 (D.N.J. Apr. 17, 2008) ("A 'pharmaceutical composition' is a term of art used to describe a medicinal preparation comprising a mixture, prepared outside of the body, generally in the form of a dosage unit, such as a tablet or capsule."), vacated on other grounds, 344 F. App'x 595 (Fed. Cir. 2009); Takeda Pharm. Co Ltd. v. Teva Pharm. USA Inc., 542 F. Supp. 2d 342, 348-49 (D. Del. 2008) (construing "pharmaceutical composition" as "a medicinal product formed from two or more substances for use as a drug in medical treatment"); Ortho-McNeil Pharm., Inc. v. Kali Labs., 482 F. Supp. 2d 478 (D.N.J. 2007), vacated on other grounds, 344 F. App'x 595 (Fed. Cir. 2009) (construing "pharmaceutical composition" to mean a single dosage form and not separate administration of the component drugs); Abbott Labs. v. Sandoz, 529 F. Supp. 2d 893, 903 (N.D. Ill. 2007) (explaining the phrase "pharmaceutical composition" has its "plain and ordinary meaning as understood by a skilled artisan" as "an aggregated product formed from two or more substances for use as a drug in medical treatment").

necessarily infringe." Ricoh Co., Ltd. v. Quanta Computer Inc.,
550 F.3d 1325, 1341 (Fed. Cir. 2008); see also Meyer
Intellectual Props. Ltd. v. Bodum, Inc., 690 F.3d 1354, 1366
(Fed. Cir. 2012) ("It is well-established that a finding of
direct infringement is a prerequisite to a finding of
inducement.") (citation omitted).

Here, while the Court has preliminarily determined that
Claim 1 requires a single composition, or tablet, containing
aripiprazole in combination with either citalopram and/or
escitalopram, Defendants' proposed generic products indisputably
contain, as stated above, only one active ingredient—
aripiprazole. (See, e.g., Torrent's Opp'n at 8; Alembic's Opp'n
at 2; Zydus's Opp'n at 1; Sun's Opp'n at 3; Teva's Opp'n at 1-3;
Actavis's Opp'n at 6; Apotex's Opp'n at 8; Hetero's Opp'n at 8
n.10; Sandoz's Opp'n at 1.) As a result, Defendants' proposed
products fundamentally cannot, on their face, directly infringe
Claim 1, and Otsuka has failed to identify any other underlying
act of direct infringement—an express requirement for
establishing inducement under 35 U.S.C. § 271(b). See Limelight
Networks, Inc., 134 S. Ct. at 2117 (noting that induced
infringement lies "if, but only if," the patentee makes a
showing of direct infringement); see also Warner-Jenkinson Co.
v. Hilton Davis Chem. Co., 520 U.S. 17, 29

45

(1997) (noting that a direct infringement claim only lies where the patentee shows that the infringing product contains each and every claim limitation). For that reason alone, Otsuka has not met its burden of demonstrating it is ultimately likely to succeed in demonstrating this critical, first element of its theory of induced infringement. Stated differently, these Defendants have raised a powerful showing that Otsuka's theory of infringement is incorrect.

Nevertheless, even if Otsuka could meet this threshold requirement, Otsuka has not established that any of these Defendants specifically and actively intend to induce infringement of asserted Claim 1, the second requirement of an induced infringement claim, for reasons next discussed.

### iii.   Otsuka Has Not Shown that Defendants Actively and Purposefully Encouraged Infringement

Otsuka argues that Defendants' proposed package inserts or labels teach that aripiprazole should be co-administered with an antidepressant like citalopram[20] and/or escitalopram, thereby inducing infringement of Claim 1 of the '350 patent. (See Otsuka's Br. at 13-17; Otsuka's Reply at 4-6.)

The Court, however, need not belabor Otsuka's position, because the Defendants' labels fail to contain, even under the

---

[20] Indeed, citalopram does not appear, at all, on Otsuka's Abilify® label.

46

reading most generous to Otsuka, any sufficiently significant specific and active instruction to, and/or encouragement of, an infringing use.

Inducement requires, as stated above, that the alleged infringer "'knowingly induced infringement and possessed [the] specific intent to encourage another's infringement.'" Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1219 (Fed. Cir. 2014) (citation omitted). Critically, however, "mere knowledge of possible infringement by others does not amount to inducement." Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363-64 (Fed. Cir. 2003). Rather, the patentee must produce evidence of active steps "taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use." MGM Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 936 (2005) (citation omitted). The relevant inquiry for purposes of inducement is not, however, "whether a user following the instructions may end up using the device in an infringing way." Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1329 n. 2 (Fed. Cir. 2009) (emphasis added). Rather, the operative inquiry concerns "whether [the] instructions [actively] teach an infringing use of the [product] such that [courts can] infer from those instructions an affirmative intent" that the product be used to infringe. Id.; see also AstraZeneca LP v. Apotex, Inc., 633

47

F.3d 1042, 1060 (Fed. Cir. 2010) (explaining that the "pertinent question" concerns "whether the proposed label <u>instructs</u> users to perform the patented method") (emphasis added).

As generics of Abilify®, these Defendants' ANDA products have the same active ingredient (aripiprazole), dosage strengths, and route of administration (oral or oral disintegrating tablets) as Abilify®.  Nevertheless, these generic Defendants' proposed package inserts differ, in material respects, from the approved Abilify® label for at least two reasons, both of which prove fatal to Otsuka's assertions of intentional action.

> **a. Defendants' "Carve Out" of the Relevant Indication Significantly Diminishes Any Suggestion of Sufficiently Intentional Action**

Critically absent from each proposed label is <u>any</u> indication that the generic aripiprazole products should be used for adjunctive treatment of major depressive disorder, the primary indication for the '350 patent.  Indeed, each generic Defendant specifically "carved-out" the pertinent indication (e.g., "adjunctive treatment for major depressive disorder") from their respective generic Abilify® labels, affirmatively relinquishing the right to actively promote use of their aripiprazole products with <u>any</u> antidepressants, including

48

citalopram and escitalopram.[21]  (<u>See, e.g.</u>, Torrent's Opp'n at 1-
2; Alembic's Opp'n at 2, 3, 6, 14, 18; Zydus's Opp'n at 22-23;
Sun's Opp'n at 12; Teva's Opp'n at 2, 13-14; Actavis's Opp'n at
13-14; Apotex's Opp'n at 11-12; Hetero's Opp'n at 17-18;
Sandoz's Opp'n at 4, 18.)  Indeed, given these Defendants'
"carve outs," Defendants cannot, as a matter of law, instruct
patients and/or prescribers to use their aripiprazole products
for purposes of "adjunctive treatment for major depressive
disorder," a use or indication for which <u>only</u> Otsuka holds
approval.  <u>See</u> <u>Caraco Pharm. Labs.</u>, 132 S. Ct. at 1677 (noting
that, following the FDA's acceptance of the carve-out label, the
generic company may "place its drug on the market, (assuming the
[applicant] meets other requirements), <u>but only for a subset of</u>
<u>approved uses – i.e., those not covered by the brand's patents</u>")
(emphasis added); <u>see</u> <u>also</u> <u>Bayer Schering Pharma AG v. Lupin,</u>
<u>Ltd.</u>, 676 F.3d 1316, 1322-23 (Fed. Cir. 2012) (generally noting
that the applicable FDA regulations prohibit generic

---

[21] The carve-out provisions, 21 U.S.C. § 355(j)(2)(A)(viii) and
21 C.F.R. § 314.94 (a)(12)(iii)(A), specifically permit an ANDA
applicant to submit a "section viii statement" certifying that
the applicant does not seek approval for any indications or uses
asserted to be covered by a patent from the proposed label in
the ANDA.  <u>See</u> <u>Caraco Pharm. Labs. v. Novo Nordisk A/S</u>, 132 S.
Ct. 1670, 1676-77 (2012).  In connection with the submission of
a section viii statement, "the ANDA applicant must include [for
approval] a proposed label that removes or 'carves out' the
claimed method of use."  <u>Bayer Schering Pharma AG. v. Lupin,</u>
<u>Ltd.</u>, 676 F.3d 1316, 1318 (Fed. Cir. 2012).

pharmaceutical companies from implying or suggesting that the generic product has indications or uses other than those approved by the FDA).

The fact that <u>all</u> of these Defendants actively and voluntarily removed any reference to the allegedly infringing indication, in turn, belies any suggestion that these Defendants acted with the specific intention to encourage infringement. Indeed, this affirmative action would seem to negate any reasonable inference of an active intent to induce infringement. See <u>Acorda Therapeutics Inc. v. Apotex Inc.</u>, No. 07-4937, 2011 WL 4074116, at *16 (D.N.J. Sept. 6, 2011), <u>aff'd</u>, 476 F. App'x 746 (Fed. Cir. 2012). For that reason, Otsuka has not demonstrated a likelihood of success on its claim that these Defendants induce infringement of Claim 1 of the '350 patent. See <u>AstraZeneca</u>, 669 F.3d at 1377-78 ("[a] patented method of using a drug can only be infringed under § 271(e)(2) by filing an ANDA that seeks approval to market the drug for that use."); <u>Warner-Lambert Co.</u>, 316 F.3d at 1364-65 ("[T]he request to make and sell a drug labeled with a permissible (non-infringing) use cannot reasonably be interpreted as an act of infringement (induced or otherwise) with respect to a patent on an unapproved use" (emphasis added)).

**b. Defendants' Proposed Labels Do Not Reflect Actual Instruction in Furtherance of Inducing Infringement**

In addition, the Court also finds significant deficiencies in Otsuka's positions concerning the substance of Defendants' actual labels. Critically, Otsuka does not claim that any individual Defendant instructs and/or encourages the infringing use of its aripiprazole product in either of the key sections of the package inserts: "INDICATIONS AND USAGE" or "DOSAGE AND ADMINISTRATION." See Bayer Schering Pharma AG, 676 F.3d at 1321 (discussing the substantive importance of the "Indications and Usage" portion of a product label). Nor does Otsuka dispute that none of the Defendants' labels even refer to citalopram, much less the coadministration of aripiprazole with citalopram.

Rather, Otsuka's position on induced infringement hinges upon the fact that the black box warnings and related sections of Defendants' labels purportedly imply that the adjunctive use of aripiprazole with any antidepressant results in reduced rates of suicidality in patients aged 65 and older; identify escitalopram and/or "substrates of CYP2C19" as drugs without any clinically important interactions with aripiprazole; and otherwise discuss and/or reference the use of antidepressants, generally, in conjunction with aripiprazole.

51

Otsuka specifically points to the following emphasized portions of Defendants' proposed package inserts which the Court has grouped for convenience into representative examples of the relevant sections of Defendants' labels:



| WARNING: INCREASED MORTALITY IN ELEDERLY PATIENTS WITH DEMENTIA-RELATED PSYCHOSIS and SUICIDAL THOUGHTS AND BEHAVORS WITH ANTIDEPRESSANT DRUGS[22] | |
|---|---|
| ▮▮▮▮,[23] and ▮▮▮[24] | ▮▮▮▮▮▮▮ |
| Anyone considering the use of adjunctive aripiprazole or any other antidepressant in a child, adolescent, or young adult must balance this risk with the clinical need. Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction in risk with antidepressants compared to placebo in adults aged 65 and older. Depression and certain other psychiatric disorders are themselves associated with increases in | Antidepressants increased the risk of suicidal thoughts and behavior in children, adolescents, and young adults in short-term studies. These studies did not show an increase in the risk of suicidal thoughts and behavior with antidepressants use in patients over ager 24; there was a reduction in risk with antidepressant use in patients aged 65 and older [see Warnings and Precautions (5.2)]. |

[22] The section heading of ▮▮▮▮▮▮▮▮ label omits the phrase "with antidepressant drugs."
[23] By letter dated April 14, 2015, counsel for ▮▮▮ advised the Court that ▮▮▮ recently amended its label, but asserts that the "labeling amendment does not change the TRO infringement inquiry because ▮▮▮ modified labels remain similar (and with respect to some passages that Otsuka has relied on to support its infringement allegations, identical) to the labels of the other defendants." [See, e.g., Docket Item 97 in 14-6398.]
[24] On the oral argument record on April 10, 2015, counsel for ▮▮▮▮ represented that recent amendments to Otsuka's Abilify® label would require ▮▮▮▮▮▮▮, to conform their warning language to that of the other generic Defendants in these actions.

| the risk of suicide. Patients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised of the need for close observation and communication with the prescriber. Aripiprazole is not approved for use in pediatric patients with depression. | |
|---|---|

| WARNINGS AND PRECAUTIONS |
|---|
| **Clinical Worsening of Depression and Suicide Risk/Suicidal Thoughts and Behaviors in Children, Adolescents, and Young Adults** |
| ██████████████████████████████████████<br>██████████████████ |
| **All patients being treated with antidepressants for any indication** should be monitored appropriately and observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases. |

| ██████████████████████ | ████████████████ |
|---|---|
| **Screening Patients for Bipolar Disorder:** A major depressive episode may be the initial presentation of bipolar disorder. It is generally believed (though not established in controlled trials) that treating such an episode with an antidepressant alone may increase the likelihood of precipitation of a | **Screening Patients for Bipolar Disorder:** A major depressive episode may be the initial presentation of bipolar disorder. It is generally believed (though not established in controlled trials) that treating such an episode with an antidepressant alone may increase the likelihood of precipitation of a |

53

mixed/manic episode in patients at risk for bipolar disorder. Whether any of the symptoms described above represent such a conversion is unknown. However, prior to initiating treatment with an antidepressant, patients with depressive symptoms should be adequately screened to determine if they are at risk for bipolar disorder; such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression.

It should be noted that aripiprazole is not approved for use in treating depression in the pediatric population.

mixed/manic episode in patients at risk for bipolar disorder. Whether any of the symptoms described above represent such a conversion is unknown. However, prior to initiating treatment with an antidepressant, patients with depressive symptoms should be adequately screened to determine if they are at risk for bipolar disorder; such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression.

## Metabolic Changes
## Weight Gain

█████████████████████████████████ [25]

In the trials adding aripiprazole to antidepressants, patients first received 8 weeks of antidepressant treatment followed by 6 weeks of adjunctive aripiprazole or placebo in addition to their ongoing antidepressant treatment. The mean change in body weight in patients receiving adjunctive aripiprazole was + 1.7 kg (N=347) compared to +0.4 kg (N=330) in patients receiving adjunctive placebo.

## ADVERSE REACTIONS
## 6.1 Overall Adverse Reactions Profile

████████████████████████████████

The conditions and duration of treatment with aripiprazole (monotherapy and adjunctive therapy with antidepressants or mood stabilizers) included (in overlapping categories) double-blind, comparative and noncomparative open-label studies, inpatient

---

[25] On the oral argument record on April 10, 2015, counsel for Otsuka argued that ███████ label contains this, or a substantially similar, provision. The Court, however, located no such language in ███████ label in the present record.

and outpatient studies, fixed- and flexible-dose studies, and
short- and longer-term exposure.

| 7.2 Drugs Having No Clinically Important Interactions with Aripiprazole[26] | | |
| --- | --- | --- |
| ███████████ ██ 7 | ████████ ██████ | ████████ ███████ |
| **Escitalopram**<br><br>Coadministration of 10mg/day oral does of aripiprazole for 14 days to healthy subjects had no effect on the steady-state pharmacokinetics of 10mg/day escitalopram, a substrate of CYP2C19 and CYP3A4. No dosage adjustment of escitalopram is required when aripiprazole is added to escitalopram. | Based on pharmacokinetic studies, no dosage adjustment of aripiprazole is required when administered concomitantly with famotidine, valproate, lithium, lorazepam.<br><br>In addition, no dosage adjustment is necessary for substrates of CYP2D6 (e.g., dextromethorphan, fluoxetine, paroxetine, or venlafaxine), CYP2C9 (e.g., warfarin), CYP2C19 (e.g., omeprazole, warfarin, escitalopram), or CYP3A4 (e.g., dextromethorphan) when co-administered with aripiprazole. Additionally, no | Based on pharmacokinetic studies, no dosage adjustment of aripiprazole is required when administered concomitantly with famotidine, valproate, lithium, lorazepam.<br><br>In addition, no dosage adjustment is necessary for substrates of CYP2D6 (e.g., dextromethorphan, fluoxetine, paroxetine, or venlafaxine), CYP2C9 (e.g., warfarin), CYP2C19 (e.g., omeprazole, warfarin, or CYP3A4 (e.g., dextromethorphan) when co-administered with aripiprazole. Additionally, no dosage adjustment |

---

[26] This language appears in section 7.3 on ████████████████
████████ package insert.
[27] On the oral argument record on April 10, 2015, counsel for
████████ represented that recent amendments to Otsuka's Abilify®
label would also require ██████████████████████████████
████, to conform their section 7.2 language to a very similar
variant of that used by the other generic Defendants in these
actions.

|  | dosage adjustment is necessary for valproate, lithium, lamotrigine, lorazepam, or sertraline when co-administered with aripiprazole. [*see* CLINICAL PHARMACOLOGY (12.3)]. | is necessary for valproate, lithium, lamotrigine, lorazepam, or sertraline when co-administered with aripiprazole. [*see* CLINICAL PHARMACOLOGY (12.3)]. |
|---|---|---|

---

**MEDICATION GUIDE**
**Aripiprazole Tablets**

████████████████████████████████████████ [28]

Read this Medication Guide before you start taking aripiprazole and each time you get a refill. There may be new information. This Medication Guide does not take the place of talking to your health care provider about your medical condition or treatment.

<u>What is the most important information I should know about aripiprazole tablets</u>?

(For other side effects, also see "What are the possible side effects of aripiprazole tablets?").

Serious side effects may happen when you take aripiprazole, including:
• Increased risk of death in elderly patients with dementia-related psychosis: Medicines like aripiprazole can raise the risk of death in elderly people who have lost touch with reality (psychosis) due to confusion and memory loss (dementia). Aripiprazole is not approved for the treatment of patients with dementia-related psychosis.

• Risk of suicidal thoughts or actions: <u>Antidepressant medicines</u>, depression and other serious mental illnesses, and suicidal thoughts or actions:

1. **<u>Antidepressant medicines may increase suicidal thoughts or actions in some children, teenagers, and young adults within the first few months of treatment.</u>**
2. **Depression and other serious mental illnesses are the most important causes of suicidal thoughts and actions. Some people may**

---

[28] Though the Medicine Guide of each Defendant may contain slight variations, all remain substantially similar in relevant part.

**have a particularly high risk of having suicidal thoughts or actions.** These include people who have (or have a family history of) bipolar illness (also called manicdepressive illness) or suicidal thoughts or actions.

3. **How can I watch for and try to prevent suicidal thoughts and actions in myself or a family member?**
   - Pay close attention to any changes, especially sudden changes, in mood, behaviors, thoughts, or feelings. This is very important when an antidepressant medicine is started or when the dose is changed.
   - Call the healthcare provider right away to report new or sudden changes in mood, behavior, thoughts, or feelings.
   - Keep all follow-up visits with the healthcare provider as scheduled. Call the healthcare provider between visits as needed, especially if you have concerns about symptoms.

**Call a health care provider right away if you or your family member has any of the following symptoms, especially if they are new, worse, or worry you:**

- thoughts about suicide or dying
- attempts to commit suicide
- new or worse depression
- new or worse anxiety
- feeling very agitated or restless
- panic attacks
- trouble sleeping (insomnia)
- new or worse irritability
- acting aggressive, being angry, or violent
- acting on dangerous impulses
- an extreme increase in activity and talking (mania)
- other unusual changes in behavior or mood

**What else do I need to know about antidepressant medicines?**

- **Never stop an antidepressant medicine without first talking to a healthcare provider.** Stopping an antidepressant medicine suddenly can cause other symptoms.

- **Antidepressants are medicines used to treat depression and other illnesses.** It is important to discuss all the risks of treating depression and also the risks of not treating it. Patients and their families or other caregivers should discuss all treatment choices with the healthcare provider, not just the use of antidepressants.

- **Antidepressant medicines have other side effects.** Talk to the healthcare provider about the side effects of the medicine prescribed for you or your family member.

57

> • **Antidepressant medicines can interact with other medicines.**
> Know all of the medicines that you or your family member takes.
> Keep a list of all medicines to show the healthcare provider. Do
> not start new medicines without first checking with your
> healthcare provider.
>
> • **Not all antidepressant medicines prescribed for children are
> FDA approved for use in children.** Talk to your child's healthcare
> provider for more information.

As illustrated above, Otsuka's theory of induced
infringement turns, in its entirety, upon fleeting references to
antidepressants, certain generic Defendants' <u>single</u> reference to
the coadministration of their respective aripiprazole products
with escitalopram, and Defendants' general reference to
antidepressants.   In these respects, Otsuka's position
principally relies upon contraindications and language tending
to warn about aripiprazole's potential effects and/or adverse
reactions/interactions.   But, a warning is just that—a warning.
It is not an instruction to coadminister aripiprazole with any
particular drug, much less escitalopram or citalopram, the <u>only</u>
antidepressants covered by Claim 1.

Indeed, courts have repeatedly found incidental references
to even infringing uses in these sections insufficient to
constitute instruction or encouragement, as opposed to mere
permission, and have consistently rejected safety discussions as
a basis for inducement liability.   <u>See, e.g.</u>, <u>United
Therapeutics Corp.</u>, 2014 WL 4259153, at *18 (noting that "there
is a rather significant difference between a warning and an

instruction"); <u>Shire LLC v. Amneal Pharm., LLC</u>, No. 11-3781, 2014 WL 2861430, at *3-6 (D.N.J. June 23, 2014) (noting the difference between "permission" and the "encouragement" required to show inducement, and granting summary judgment of the issue of inducement where the accused product package insert could, at most, "be understood to permit an infringing use"); <u>Aventis</u>, 355 F. Supp. 2d at 598-99.  Otsuka fares no better in this case, because Defendants' labels do not manifest any intention to induce infringement, much less the <u>active</u> and <u>specific</u> intention required to support its theory of inducement.

Nevertheless, the Court finds the deficiency in Otsuka's argument best illustrated by the following side-by-side comparison of relevant sections of Otsuka's Abilify® insert to that of each of these generic Defendants:

| Otsuka's ABILIFY® (aripiprazole) Tablets label (**Ex. B to Roth Dec.**) | Torrent's Aripiprazole ████████ Label (**Ex. 1 to Hunnicut Dec.**) |
|---|---|
| **BLACK BOX WARNINGS**<br><br>**1 INDICATIONS AND USAGE**<br>ABILIFY is an atypical antipsychotic.  The oral formulations are indicated for...<br><br>...<br><br>Adjunctive Treatment of Major Depressive Disorder<br><br>... | 1. **No** reference to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder, **other than in black box warning**.<br>2. **No** reference to coadministration of aripiprazole with citalopram<br>3. Only **one** reference to escitalopram in section 7.3, entitled "Drugs Having No Clinically Important Interactions with Aripiprazole"] |

| | |
|---|---|
| Adjunctive Treatment of Major Depressive Disorder [see CLINICAL STUDIES (14.3)] | **Alembic's Aripiprazole Label (Alembic's Br. at 15-16.)** |
| **2 DOSAGE AND ADMINISTRATION** | 1. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder |
| ... | 2. **No** reference to coadministration of aripiprazole with citalopram |
| **2.3 Adjunctive Treatment of Major Depressive Disorder** | 3. Escitalopram appears **twice**, once in section 7, "DRUG INTERACTIONS," and again in section 12, "CLINICAL PHARMACOLOGY" |
| **Adults** | |
| The recommended starting dose for ABILIFY as adjunctive treatment for patients already taking an antidepressant is 2 mg/day to 5 mg/day. The recommended dosage range is 2 mg/day to 15 mg/day. Dosage adjustments of up to 5 mg/day should occur gradually, at intervals of no less than 1 week [see CLINICAL STUDIES (14.3)}. Patients should be periodically reassessed to determine the continued need for maintenance treatment. | **Zydus's Aripiprazole ▆▆ Label (Exs. 1 & 2 to Srinivas Dec.)**<br><br>1. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder<br>2. **No** reference to the coadministration of aripiprazole with **any** antidepressant<br>3. Escitalopram appears **once** in section 7.2, "Drugs Having No Clinically Important Interactions with Aripiprazole" |
| **6 ADVERSE REACTIONS** | **Sun's Aripiprazole Label (Ex. 2 to Gangasani Dec.)** |
| ... | 1. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder |
| **6.1 Clinical Trials Experience** | 2. **No** reference to coadministration of aripiprazole with citalopram or escitalopram |
| **Adult Patients Receiving ABILIFY as Adjunctive Treatment of Major Depressive Disorder** | |
| The following findings are based on a pool of two placebo-controlled trials of patients with major depressive disorder in which ABILIFY was administered at doses of 2 mg to 20 mg as adjunctive treatment to continued antidepressant therapy. | **Teva's Aripiprazole Label (Ex. 2 to Birbach Dec.)**<br><br>1. **No** reference to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder, |
| *Adverse Reactions Associated with Discontinuation of Treatment* | |

| | |
|---|---|
| The incidence of discontinuation due to adverse reactions was 6% for adjunctive ABILIFY-treated patients and 2% for adjunctive placebo-treated patients.<br><br>*Commonly Observed Adverse Reactions*<br><br>The commonly observed adverse reactions associated with the use of adjunctive ABILIFY in patients with major depressive disorder (incidence of 5% or greater and ABILIFY incidence at least twice that for placebo) were: akathisia, restlessness, insomnia, constipation, fatigue, and blurred vision.<br><br>*Less Common Adverse Reactions in Adult Patients with Major Depressive Disorder*<br><br>...<br><br>**7 DRUG INTERACTIONS**<br><br>...<br><br>**7.2 Drugs Having No Clinically Important Interactions with ABILIFY**<br><br>...<br><br>no dosage adjustment is necessary for substrates of CYP2D6 (e.g., dextromethorphan, fluoxetine, paroxetine, or venlafaxine), CYP2C9 (e.g., warfarin), CYP2C19 (e.g., omeprazole, warfarin, escitalopram), or CYP3A4 (e.g., dextromethorphan) when co-administered with ABILIFY...<br><br>... | **other than in black box warning**.<br>2. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder<br>3. **No** reference to coadministration of aripiprazole with citalopram or escitalopram, only **more generally** to antidepressants.<br><br>**Actavis's Aripiprazole Label (Ex. D to Gannon Dec.)**<br><br>1. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder<br>2. **No** reference to coadministration of aripiprazole with citalopram or escitalopram<br><br>**Apotex's Aripiprazole Label (Ex. 1 to Halper Dec.)**<br><br>1. **No** reference to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder, **other than in black box warning**.<br>2. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder<br>3. **No** reference to coadministration of aripiprazole with citalopram<br>4. Escitalopram appears **once** in section 7.2, "Drugs Having No Clinically Important Interactions with Aripiprazole"<br><br>**Hetero's Aripiprazole Label (Ex. 6 to Ives Dec.)** |

| 14.3 Adjunctive Treatment of Major Depressive Disorder | 1. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder<br>2. **No** reference to coadministration of aripiprazole with citalopram or escitalopram |
|---|---|
| **Adults**<br><br>The efficacy of ABILIFY in the adjunctive treatment of major depressive disorder... | |
| **MEDICATION GUIDE**<br><br>... | **Sandoz's Aripiprazole Label (Ex. 5 to Fues Dec.)** |
| **WHAT IS ABILIFY?**<br>• **ABILIFY Oral Tables, Orally-Distintegrating Tablets, and Oral Solution are prescription medicines used to treat:**<br>...<br>  o major depressive disorder (MDD) when ABILIFY is used with antidepressant medicines | 1. **No** references to the use of the generic for the Adjunctive Treatment of Major Depressive Disorder<br>2. **No** reference to coadministration of aripiprazole with citalopram or escitalopram |

Critically, in arguing that Defendants' labels contain "compelling encouragement" to prescribe aripiprazole in a manner that infringes Claim 1, i.e., in conjunction with escitalopram and/or citalopram, Otsuka entirely ignores the context in which the warning language appears and relies upon language too general to constitute active encouragement to prescribe an infringing combination aripiprazole product.

Indeed, in insisting that these Defendants' labels induce infringement, Otsuka relies, almost exclusively, upon language that warns of the potential risks associated with the interaction between aripiprazole and antidepressants, generally. The term "antidepressants," however, identifies a general class of "different drugs," comprised of "about two dozen" varieties.

62

(Calabrese Dec. at ¶ 33.)  Claim 1, however, only concerns one limited and narrow subset of antidepressants, namely, citalopram and escitalopram.  In that respect, Otsuka argues that a reference to the broad and far larger class of antidepressants necessarily amounts to substantial encouragement of an infringing combination product.  The Court, however, can hardly imagine that a general reference to antidepressants will inevitably encourage the combination of aripiprazole and escitalopram and/or citalopram, the only relevant combination for purposes of Otsuka's theory of induced infringement.  As a result, any discussion of antidepressants generally cannot be taken as active instruction to encourage users to perform a patented method that, on its face, concerns only citalopram and escitalopram. AstraZeneca, 633 F.3d at 1060.  Rather, only references to aripiprazole in combination with escitalopram and/or citalopram (of which Defendants' labels contain almost none), provide the only arguable support for even a preliminary finding in Otsuka's favor on inducement.

Moreover, even if the Court accepted Otsuka's position that a reference to "antidepressants" would necessarily evoke escitalopram and/or citalopram in the mind of any reader, the Court cannot find that the information admittedly contained only in the warning provisions of Defendants' labels demonstrates the

active instruction necessary for purposes of inducement.  (See generally Roth Dec.)

Indeed, the weight of authority has deemed warning and safety information insufficient to constitute inducement, requiring instead that the information be set forth in the "Uses and Indication" or "Dosing and Administration" sections of the allegedly offending labels.  See, e.g., Shire, 2014 WL 2861430, at *3-6; Takeda, ____ F. Supp. 3d ____, 2014 WL 5780611, at *5-6; United Therapeutics Corp. v. Sandoz, Inc., No. 12-1617, 2014 WL 4259153, at *16-21 (D.N.J. Aug. 29, 2014); Aventis Pharma Deutschland GmbH v. Cobalt Pharm., Inc., 355 F. Supp. 2d 586, 598-99 (D. Mass. 2005).

One court in this District has in fact persuasively noted the "rather significant difference between a warning and an instruction."  United Therapeutics Corp., 2014 WL 4259153, at *18.  "A warning provides information regarding a potential risk," but stops short of prescribing a specific "course of action."  Id.  An instruction, on the other hand, specifically directs that a particular action, or series of actions be taken. Id.  In that regard, the United court concluded, in essence, that if a patentee must engage in a "scholarly scavenger hunt" through the label to identify statements that may inferentially but not inevitably tie to a physician's thoughts or acts, the inducement theory necessarily fails.  United, 2014 WL 4259153,

64

at *19 (rejecting the argument that, "a scholarly scavenger hunt—which may be incited by a reference in Sandoz's proposed label, which may be undertaken by some physicians, and may ultimately result in a discovery which leads some physicians to prescribe SDF as a diluent for [d]efendant's generic product, despite [d]efendant's carve out—may constitute evidence of [the defendant's] intent to induce physicians to engage in infringing conduct" suffices for purposes of induced infringement); see also Takeda, ___ F. Supp. 3d ____, 2014 WL 5780611, at *5-6 (relying upon United, and rejecting inducement theory when generic label's warning and safety information would not "inevitably" lead to infringing acts), aff'd, Nos. 15-1139, 15-1142 (Fed. Cir. Jan. 9, 2015).  Another court in this district has similarly—and also persuasively—noted, in the context of an induced infringement claim, that "permit[ting] an infringing" use differs, in significant respects, "from encouragement." Shire, 2014 WL 2861430, at *5.

The disputed warnings in this instance do far less, and do not, by their very natures, encourage underlying, infringing behavior.

Indeed, in their black box warnings, Defendants uniformly disclose that "short-term studies" indicate that the use of aripiprazole in conjunction with antidepressants increases the risk of suicidality in children, adolescents, and young adults;

has no impact on the risk of suicidality in patients over age 24; and results in a decreased risk of suicidality in patients aged 65 and older.  Nevertheless, Otsuka argues that these provisions constitute active encouragement to prescribe an infringing product, to the extent the language discloses that the adjunctive use of aripiprazole results in a decreased risk of suicidality in a certain population.  As a result, Otsuka asserts that these Defendants' labels actively instruct the beneficial combination of aripiprazole with escitalopram and/or citalopram at least with respect to those older than 64.

In so arguing, however, Otsuka mischaracterizes the fundamental nature and placement of this information.  Indeed, placed in context, the language does not actively instruct and/or encourage the use of an infringing aripiprazole combination, nor does it actively tout the benefits of aripiprazole's adjunctive use.  Rather, due to increased suicidality, the language plainly discourages the use of aripiprazole in combination with any other antidepressant because the combination places "[c]hildren, adolescents, and young adults ... at increased risk of suicidal thinking." (See, e.g., ██████████████████████████████████ ██████████████████████████████████ The warning therefore cautions that, "[a]nyone considering the use of adjunctive aripiprazole or any other antidepressant in" a

pediatric patient should "balance this risk with clinical need," but discloses that the combination reduces the risk of suicidality in "adults aged 65 and older."  Given this context, namely the fact that the combination of aripiprazole and antidepressants results in some increased risk of suicidality, the notation to a possibly reduced risk of suicidality in the over-65 population can hardly be described as a ringing endorsement of the adjunctive use of aripiprazole.

Rather, these warnings, as a whole, serve to discourage adjunctive use in certain populations, by specifically placing physicians on notice of the potential harmful side effects and contraindications.  Against this backdrop, the remaining statements convey, at most, indifference to the administration of the ANDA products in conjunction with an antidepressant, and imply that aripiprazole could be administered with an antidepressant, without any increased risk of suicide in adults aged 65 and older.  They do not, however, actively encourage or direct such administration.  Takeda, ___ F. Supp. 3d ____, 2014 WL 5780611, at *5 (noting that the relevant question is "whether the proposed label is a sufficient catalyst to constitute active steps taken to encourage direct infringement of the [patents at issue]"), aff'd, Nos. 15-1139, 15-1142 (Fed. Cir. Jan. 9, 2015).  Rather, they specifically warn of the potential pitfalls and risks of the combination, in recognition of the primary market

67

to which these generic aripiprazole products may be prescribed, namely, to individuals with multiple and perhaps overlapping psychological and/or emotional disorders, and who may happen to be taking an antidepressant.  In that respect, this safety information must necessarily be inclusive because, despite having carved out any indication of major depressive disorder, Defendants cannot prevent their aripiprazole products from being prescribed in connection with antidepressants.  And, in that respect, Defendants' black box warnings convey little more than the knowledge of possible infringement, not the specific intent and action to induce required for infringement.  Warner-Lambert, 316 F.3d at 1364.

Nor can the Court conclude that the isolated references to escitalopram in the Clinical Pharmacology and Drug Interactions sections of certain Defendants' labels compel any different conclusion.  Indeed, escitalopram appears amongst references to a laundry list of disparate drugs used to treat conditions far removed from that indicated by the '350 patent like, for example, high blood pressure (warfarin) or excess stomach acid (omeprazole), and Otsuka has provided no sufficient explanation as to how this information might induce anyone to do anything. As a result, these limited references in labels that each exceed 50 pages can hardly be described as an indication of these Defendants' active encouragement of infringement.

For all of these reasons, the Court concludes that these Defendants' labels provide no sufficient indication that the information cited by Otsuka will inevitably and necessarily lead to infringing acts, an essential showing for Otsuka's inducement claim.[29]  The Court finds, therefore, that it is highly unlikely that Otsuka will be able to demonstrate that Defendants' proposed labels for generic aripiprazole instruct or encourage an infringing use because nothing therein suggests combining aripiprazole and either citalopram or escitalopram in a single dose.  See, e.g, id. (finding that the plaintiff had not demonstrated that the label would "'inevitably lead to infringing acts.'"); Bayer Schering Pharma AG v. Lupin, Ltd., 676 F.3d 1316, 1322 (Fed. Cir. 2012) (statements in the label did not show that the product was safe and effective for the purposes of inducing the three claimed effects); Acorda, 2011 WL 4074116, *17-19 (D.N.J. Sept. 6, 2011), aff'd, 476 F. App'x 746

---

[29] Nor does Otsuka's reliance upon AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042 (Fed. Cir. 2010), require any different result. (See Otsuka's Br. at 14, 15, 17.)  Critically, in affirming the district court's grant of a preliminary injunction, the AstraZeneca court relied upon the fact that the generic's label contained explicit instructions in the "Dosage and Administration" section to administer the product in an infringing manner. Id. at 1057-59.  Here, however, and as stated above, these Defendants' labels contain no similar, explicit instruction to administer aripiprazole with "citalopram, escitalopram, [or] salts thereof" as required by the asserted Claim 1.  Nor does any even remotely analogous warning language appear in the "Dosage and Administration" portions of Defendants' labels.

(Fed. Cir. 2012) (where label only alerted users to the issues related to switching between tablets and capsules, label did not show the generic defendant's intent to induce infringement); Shire, 2014 WL 2861430, at *5-6 (D.N.J. June 23, 2014) (finding no inducement where "[t]he labels [did] not say that the products are indicated for the [infringing] treatment of amphetamine abuse," despite including information regarding human abuse liability studies).

> ### c. The Substantial Non-Infringing Uses Further Diminish Any Inference of the Requisite Specific Intent to Induce Infringement

The "existence of a substantial non-infringing use does not," as a matter of law, "preclude a finding of inducement." Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1364 (Fed. Cir. 2012) (finding that the district court erred, as a matter of law, in holding that the existence of a substantial non-infringing use preclude[d] a finding of induced infringement). Nevertheless, in the event a product has substantial non-infringing uses, the Court cannot infer intent to induce infringement, even if these Defendants had "actual knowledge" that some of their products would infringe the '350 patent. Warner-Lambert, 316 F.3d at 1365.

The overwhelmingly predominant use of Abilify® is as a tablet containing only aripiprazole as the active ingredient,

70

which is not the combination drug claimed by the '350 patent. Likewise, the Defendants' proposed generic aripiprazole contains only aripiprazole as repeatedly noted above.  The undeniably non-infringing use of aripiprazole's generic dosage will thus constitute the substantial and dominant usage having nothing to do with co-administration of aripiprazole and citalopram or escitalopram antidepressants.

Moreover, although the parties dispute the exact percentage of non-infringing use, the record contains no dispute that the non-infringing uses remain, under <u>any</u> parties' estimation, substantial.  (<u>Compare</u> Hetero's Opp'n at 3-4 (arguing that the "peripheral" material covered by the '350 patent concerns ████ ██ of Otsuka's overall market), <u>with</u> Otsuka's Reply at 10 (arguing that product covered by the '350 patent results in ███████████ of Otsuka's overall market).)  Moreover, because none of these Defendants intend to launch the product claimed by Claim 1 of the '350 patent, 100% of these Defendants' proposed sales would constitute non-infringing uses.

Therefore, for this additional reason, the Court finds that Defendants' labels provide no basis from which to infer a specific intent to encourage infringement.  <u>See</u> <u>Vita-Mix Corp.</u>, 581 F.3d at 1329 ("The amended product instructions teach an undisputedly non-infringing use, evidencing intent to discourage infringement."); <u>see</u> <u>also</u> <u>Takeda Pharm. USA, Inc. v. West-War</u>

71

Pharm. Corp., ___ F. Supp. 3d ____, No. 14-1268, 2014 WL
5780611, at *3 (finding substantial 43.75% non-infringing use).

     In conclusion, Otsuka has failed to prove likelihood of
success on its claim for direct infringement or induced
infringement in the event these generic products are launched
after April 20, 2015.

     **2. Defendants Have Raised a Substantial Question of
Invalidity**

     In addition to concluding that Otsuka has not demonstrated
a likelihood of success on its theory of induced infringement,
the Court additionally, and in the alternative, concludes that
these Defendants have raised a substantial question of
invalidity.

     As relevant here, these Defendants,[30] argue that certain
"prior art" references, namely, U.S. Patent No. 7,973,043

---

[30] Though only Alembic, Apotex, Hetero, Torrent, and Sandoz (by
sur-reply) substantively briefed the issue of invalidity, Sun,
Teva, and Actavis specifically incorporated those discussions by
reference into their oppositions, and restated their intentions
to rely upon Alembic's, Apotex's, and Hetero's invalidity
positions on the oral argument record on April 10, 2015.  At the
hearing, counsel for Otsuka objected to these Defendants'
incorporation. Nevertheless, because the question of invalidity
presents a common question of law with equal application to all
joining Defendants, the Court will, in its discretion, consider
the invalidity arguments as if fully set forth in each
Defendant's briefing.  The Court will, however, exclude Zydus,
the only Defendant which expressed "no position" concerning
invalidity, and instead "reserve[d] the right to assert any and
all" invalidity defenses in the event the Court granted Otsuka's
motion to amend.  (Zydus's Opp'n at 3 n.1)

(hereinafter, "Migaly '043 patent"), anticipated Claim 1 and/or rendered Claim 1 obvious.[31] (See Alembic's Opp'n at 19-22; Apotex's Opp'n at 15-17; Hetero's Br. at 21-24.)  Otsuka, for its part, does not dispute the substantive identity between the elements claimed by the '350 patent and those disclosed in the Migaly '043 patent.  (See Otsuka's Reply at 7.)  Rather, Otsuka argues that the Migaly '043 patent, which issued on July 5, 2011, cannot claim priority based upon the July 30, 2002 filing of Provisional Application No. 60/319,436 (hereinafter, the "Migaly Provisional"), because the Migaly '043 patent differs in material and substantial respects from the Migaly Provisional. (Id.; see also Roth Supplemental Dec. at ¶¶ 7-15.)

A patent is invalid if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United

---

[31] Additionally, and in the alternative, these Defendants argue that International Application Publication No. WO 99/62522 (hereinafter, "Tollefson"), and U.S. Patent Publication No. 2002/0156067 (hereinafter, "Wong"), taken together, render Claim 1 invalid on obviousness grounds, and/or demonstrate that the product claimed by the '350 patent was otherwise within the public knowledge during the relevant period. (See, e.g., Alembic's Br. at 23-24; Apotex's Br. at 16-17; Hetero's Br. at 22-23.)  Nevertheless, because the Court concludes that these Defendants have demonstrated a substantial question of invalidity based upon the Migaly '043 patent, the Court need not reach Defendants' alternative arguments concerning invalidity based upon Tollefson in view of Wong, or the public knowledge.

States." 35 U.S.C. § 102(b) (2006).[32]  A prior art reference,
however, "can only anticipate a claim if it discloses all the
claimed limitations 'arranged or combined in the same way as in
the claim.'"  Kennametal, Inc. v. Ingersoll Cutting Tool Co.,
___ F.3d _____, 2015 WL 1319364 (Fed. Cir. Mar. 25, 2015)
(quoting Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC, 683 F.3d
1356, 1361 (Fed. Cir. 2012) (quoting Net MoneyIN, Inc. v.
VeriSign, Inc., 545 F.3d 1359, 1370 (Fed. Cir. 2008))).  In
order to anticipate a subsequent claim, a reference need not
"expressly spell out" the limitations or combinations disclosed
the disputed claim.  Id.  Rather, a reference anticipates a
claim if a person of skill in the art would, upon reading the
reference, "'at once envisage' the claimed arrangement or
combination."  Id. (citation omitted).

    In light of the presumption of patent validity, 35 U.S.C. §
282, and the related presumption that the USPTO "'properly'"
performed its function in reviewing patent applicatons, generic
defendants must ordinarily prove invalidity by clear and
convincing evidence.  See Cadence Pharm. Inc. v. Exela PharmSci

---

[32] The Leahy-Smith America Invents Act (hereinafter, the "AIA"),
Pub. L. No. 112-29, § 3(c), 125 Stat. 284, 287 (2011),
subsequently amended this provision. However, because the
pending claims have an effective filing date prior to March 16,
2013, the pre-AIA § 102(b) applies.  See Kennametal, Inc., ___
F.3d _____, 2015 WL 1319364, at n.3 (citing In re Giannelli, 739
F.3d 1375, 1376 n. 1 (Fed. Cir. 2014)).

Inc., ___ F.3d _____, 2015 WL 1284235 (Fed. Cir. Mar. 23, 2015).
For purposes of a preliminary injunction, however, these generic
Defendants need not prove actual invalidity.  Rather, these
generic Defendants must demonstrate a substantial question of
invalidity, that is, they must show the potential vulnerability
of the '350 patent, a showing far less rigorous than the clear
and convincing showing necessary to establish invalidity itself.
See, e.g., Celsis in Vitro, Inc. v. CellzDirect, Inc., 664 F.3d
922, 935 (Fed. Cir. 2012) (Gajarsa, J., dissenting); Kimberly-
Clark Worldwide, Inc. v. First Quality Baby Prods., LLC, 431 F.
App'x. 884, 886-87 (Fed. Cir. 2011) (noting that,
"[v]ulnerability is the issue at the preliminary injunction
stage, while validity is the issue at trial") (citations
omitted); Erico Int'l Corp. v. Vutec Corp., 516 F.3d 1350, 1356
(Fed. Cir. 2008) ("a defendant must put forth a substantial
question of invalidity to show that the claims at issue are
vulnerable"); Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1366
(Fed. Cir. 2008) (finding that the generic defendant "raised and
substantially established that the validity of the [disputed
patent was] vulnerable").

    At the outset, the Court notes that Claim 1 of the '350
patent and Claim 40 of the Migaly '043 patent disclose, on their
faces, the same general combination:

| **Claim 1 of the '350 Patent** | |
| --- | --- |

|  | **Claim 40 of the Migaly '043 Patent** |
|---|---|
| A pharmaceutical composition comprising (a) <u>aripiprazole in combination with</u> (b) at least one serotonin reuptake inhibitor selected from <u>citalopram, escitalopram</u> and salts thereof | The method of claim 11, wherein said antidepressant is selected from the group consisting of fluoxetine, norfluoxetine, paroxetine, sertraline, fluvoxamine, <u>citalopram, escitalopram</u>, zimelidine, indalpine, femoxetine, alaproclate and pharmaceutically acceptable salts thereof, <u>and</u> wherein said atypical antipsychotic drug is selected from the group consisting of risperidone, quetiapene, olanzapine, ziprasidone and <u>aripiprazole</u>. |

Despite the obvious similarities, Otsuka's expert asserts that a person of skill in the art would not immediately envisage the claimed combination, because the specific combination of aripiprazole and escitalopram/citalopram appears amongst a multiplicity of antipsychotics and antidepressants, which could arguably "result in many 1000s of different, indeterminate and in many cases combinations of drugs which exist only as hypothesized entities." (Roth Validity Dec. at ¶ 16.)  In that respect, however, Otsuka's expert overstates the elements disclosed by the Migaly '043 patent.

The Migaly '043 patent, in particular, discloses a "method for treatment of a patient suffering from major depressive disorder" (Ex. 13 to Ives Dec. at col. 32, ln. 2-3), through the

administration of a combination product comprised of an antidepressant and an antipsychotic. (Id. at col. 33, ln. 17-25.)  Claim 40 of the Migaly '043 patent then delineates 11 specific antidepressants, including citalopram and escitalopram, and 5 antipsychotics, including aripiprazole.  (Id.)  In that regard, it appears that the Migaly '043 patent discloses each and every claimed element of Claim 1 of the '350 patent.  Moreover, despite Otsuka's expert's contention that the "long list[] of antipsychotics and antidepressants" clouds any clear "recitation in the Migaly Patent that discloses the specific combination of aripiprazole and escitalopram/citalopram" (Roth Validity Dec. at ¶ 16),[33] Defendants' expert stated that he "immediately envisioned a combination of aripiprazole with either citalopram or escitalopram based [upon the Migaly '043 patent] disclosure."  (Calabrese Dec. at ¶ 39.)  Given the fact that the Migaly '043 patent limits its claimed combination to the exact elements claimed by Claim 1 of the '350 patent, the

---

[33] Curiously, with respect to infringement, Otsuka argued, as stated above, that any reference to "antidepressants" would necessarily and immediately lead any reader to envision citalopram and/or escitalopram, given their preeminence in the category of antidepressants.  With respect to invalidity, however, Otsuka appears to distance itself from this argument, claiming instead that a general reference to the category of antidepressants proves insufficient to lead a reader to immediately envision these antidepressants, despite the fact that Claim 40 of the Migaly '043 patent specifically identifies escitalopram and citalopram.

Court finds that the Migaly '043 patent raises a substantial question concerning the validity of the '350 patent.  See PPG Indus., Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1566 (Fed. Cir. 1996) ("To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter.")

Moreover, based upon the submissions, the Court cannot conclude that Otsuka's priority-based challenge demonstrates that these Defendants' invalidity position lacks substantial merit.  Indeed, Otsuka provides little support for its position that the Migaly '043 patent cannot clam priority based upon its Provisional Application.  (See generally Otsuka's Reply at 7-8; Roth Validity Dec.)  Rather, Otsuka points to the unique nature of the Migaly Provisional Application, and to the fact that it discusses "a number of disparate and abstract concepts," including several pages concerning "motivational talks intended to help people quit smoking."  (Roth Validity Dec. at ¶ 8.) Despite the Application's certain unusual features, the Court cannot ignore that the Provisional Application squarely states that it concerns a combination antidepressant and antipsychotic product for the treatment of depression.  Moreover, though the Migaly '043 patent ultimately issued on July 5, 2011, the Migaly '043 patent discloses, on its face, the July 30, 2002 Provisional Application.  (See Ex. 13 to Ives Dec.)  The '350

78

patent, by contrast, issued on June 24, 2014, and reflects a provisional filing date of December 25, 2003. (See Ex. 4 to Fues Dec.)  These provisional filing dates, in turn, generally provide the basis from which the patents "derive their priority date." Gemalto S.A. v. HTC Corp., 754 F.3d 1364, 1371-72 (Fed. Cir. 2014).  Here, the face of the patents themselves demonstrate that the Migaly inventor filed the Provisional Application more than a year before the '350 patent's initial application.  This Court is not precluded from reviewing the issue of patent validity anew, despite the fact that the Patent Examiner ultimately appears to have rejected Migaly as a prior art reference. (See Otsuka's Reply at 7-8 (generally arguing that the Patent Examiner considered and rejected Migaly as a prior art reference); see Ex. 10 to Tang Dec.)  See also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1322 (Fed. Cir. 2005) (noting that, "a court is not bound by the PTO's actions and must make its own independent determination of patent validity") (citation omitted).

Given the substantial relation and overlap between the claimed compounds, and the fact that the Migaly patent claims priority to its provisional application on its face and in its specification, the Court concludes that these Defendants (all other than Zydus) have established a substantial question of invalidity based upon the Migaly '043 patent, and that Otsuka

has not shown that this question of invalidity lacks substantial merit.  Thus, temporary injunctive relief premised upon the vulnerable '350 patent should not be granted.

**B. Otsuka Has Not Demonstrated that it Will Suffer Immediate and Irreparable Harm in the Absence of an Injunction as a result of the Market Entry of these Defendants' Aripiprazole Products**

In order to demonstrate irreparable harm, Otsuka "must make 'a clear showing'" that, in the absence of an injunction, (1) "it will suffer [immediate and] irreparable harm," and (2) "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement."[34]  Apple, Inc. v. Samsung Elecs. Co., 695 F.3d 1352, 1359-60 (Fed. Cir. 2012) (hereinafter, "Apple II").  Here, Otsuka claims that it will be irreparably harmed in the absence of an injunction, because the market entry of "infringing" generic aripiprazole products will, necessarily, result in irreversible price erosion, the loss of market share, goodwill, research and development opportunities,[35] and future

---

[34] In eBay Inc. v. MercExchange, LLC, 547 U.S. 388 (2006), the Supreme Court "jettisoned the presumption of irreparable harm" and "abolishe[d]" the Federal Circuit's prior rule "that an injunction normally will issue when a patent is found to have been valid and infringed."  Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011) (citations omitted).
[35] The Court rejects Otsuka's claim of lost opportunity to conduct research and development at the outset, because the Court of Appeals for the Federal Circuit has expressly found such a claim insufficient "to compel a finding of irreparable harm."  Eli Lilly & Co. v. Am. Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir. 1996).  Indeed, because it would be "hard to imagine any manufacturer with a research and development program that

80

and prospective business opportunities, in addition to
potentially requiring potential corporate restructuring and/or
employee layoffs. (See Otsuka's Br. at 22-28; Otsuka's Reply at
9-10.) Despite these arguments, however, the Court finds that
Otsuka has, upon this record, failed to demonstrate that these
Defendants' market entry will result in irreparable harm.[36]

### 1. Otsuka's Alleged Harms Are Quantifiable

As relevant here, "'[p]rice erosion, loss of goodwill,
damage to reputation, and loss of business opportunities'" all
constitute potential and "'valid grounds for finding irreparable
harm.'" Aria Diagnostics, Inc. v. Sequenom, Inc., 726 F.3d
1296, 1304 (Fed. Cir. 2013) (quoting Celsis in Vitro, Inc. v.
CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012)).
Nevertheless, Otsuka still bears the burden to demonstrate these
harms are unquantifiable. See ActiveVideo Networks, Inc. v.

_____

could not make the same claim," the Court of Appeals determined
that a showing of irreparable harm based upon research
opportunities would effectively "convert the 'extraordinary'
relief of a preliminary injunction into a standard remedy
available whenever the plaintiff has shown a likelihood of
success on the merits." Id.

[36] At the outset, the Court notes that Apotex argues that Otsuka
"lacks standing to claim irreparable harm," because its
"indirect subsidiary" and another entity directly market
Abilify®. (Apotex's Opp'n at 17 n.10 (citing a number of cases
that disclose the revenues of Otsuka's subsidiary).) Otsuka's
Complaint identifies Otsuka as the holder of the '350 patent by
assignment. (See Compl. at ¶ 47.) Because this action concerns
the harms caused by the alleged infringement of the '350 patent,
the Court finds that Otsuka has standing to allege irreparable
harm.

Verizon Commc'ns, Inc., 694 F.3d 1312, 1339 (Fed. Cir. 2012)
(finding that the district court erred in finding irreparable
harm based upon "clearly quantifiable" losses).  Here, however,
Otsuka has not demonstrated that the loss of market share,
sales, and/or price erosion, even if proven, constitute anything
other than purely economic and reparable loss; such losses are
insufficient to support a finding of irreparable harm.  Nor has
Otsuka demonstrated that these losses are incapable of
calculation.  Rather, Otsuka demonstrated, at most, that the
exact calculation of the damages may prove a difficult endeavor,
but that too fails to make a sufficient case for irreparable
harm.[37]

        Indeed, Otsuka's expert, John C. Jarosz, states that the
"general consequences of generic entry tend to be somewhat
predictable," and has resulted, under parallel facts, in
"virtually the same [outcome]: rapid declines almost immediately
after the entry of the generic, followed by steady and
continuing declines thereafter." (Jarosz Dec. at ¶¶ 33, 39.)
Moreover, although Mr. Jarosz ultimately concludes that the
purported injuries to Otsuka prove unquantifiable to "a

---

[37] Otsuka does not dispute that it discontinued production of its
orally disintegrating Abilify® tablets.  Therefore, the Court
cannot, at the outset, find that any irreparable harm will
result from ███████████████ efforts to market orally
disintegrating aripiprazole tablets.

reasonable degree of accuracy and certainty" (<u>id.</u> at ¶¶ 61-67), in the preceding portions of his declaration, he specifically estimated <u>and</u> quantified these alleged harms in terms of percentage losses, and he provided specific projections of Otsuka's losses in the face of generic competition. (<u>Id.</u> at ¶¶ 41, 48-51.)  Mr. Jarosz further acknowledges that these harms may prove reparable, even if "costly to reverse" or difficult to "reverse[] instantly." (<u>Id.</u> at ¶¶ 36, 62.)

Finally, the Court must note that Mr. Jarosz bases his initial estimations upon Otsuka's overbroad and unsupported construction of Claim 1, by discussing the impact of generic competition on Abilify®'s overall performance.[38]  (<u>See</u> <u>generally</u> <u>id.</u>)  In that regard, Mr. Jarosz and makes no reference to the specific types of Abilify® sales presently in dispute, i.e., only those Abilify® products covered by Claim 1 of the '350 patent.  (<u>See</u> <u>generally</u> <u>id.</u>)  Then, in his supplemental declaration, which directly addresses Abilify®'s use in

---

[38] The Court acknowledges that, under Otsuka's construction of Claim 1, the harm derived from these generic Defendants' products would have affected the entirety of its market. Nevertheless, Claim 1 would be infringed <u>only</u> if Otsuka showed that Defendants' products contained each and every claim limitation, either literally or by equivalents.  <u>Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17, 29 (1997).  Otsuka cannot legitimately contend that any of these Defendants' products contain escitalopram and/or citalopram, nor that Defendants' products are specifically indicated for the adjunctive treatment of major depressive disorder.

conjunction with citalopram and/or escitalopram, Mr. Jarosz offers little more than speculation, and largely a reiteration that a calculation of the supposed harms would prove challenging to quantify. (See generally Jarosz Supplemental Dec. at 36-74.)

The Court of Appeals for the Federal Circuit has, however, expressly concluded that "neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991) (citation omitted). Moreover, numerous courts have, based upon similar showings, expressly found the precise types of harms claimed by Otsuka—namely, loss of market share, lost sales, price erosion, and even employee layoffs—reducible to a dollar value, and therefore not irreparable. See, e.g., Graceway Pharm., LLC v. Perrigo Co., 697 F. Supp. 2d 600, 608 (D.N.J. 2010) ("loss of market share and price erosion are economic harms and are compensable by money damages .... [even] in the context of generic competition in the pharmaceutical industry"); FieldTurf USA, Inc. v. Astroturf, LLC, 725 F. Supp. 2d 609, 616-617 (E.D. Mich. 2010) ("[p]roof of lost market share and lost sales alone are insufficient to establish irreparable harm") (citation omitted); Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC, 708 F. Supp. 2d 527, 532 (D. Md. 2010)

("Because potential lost sales revenue is compensable through
damages, evidence of such losses is insufficient by itself to
support a finding of irreparable harm."); Altana Pharma AG v.
Teva Pharm. USA, Inc., 532 F. Supp. 2d 666, 682 (D.N.J. 2007)
(finding that the plaintiffs had not demonstrated irreparable
harm despite contending loss of revenue, price erosion, decrease
in market share), aff'd, 566 F.3d 999 (Fed. Cir. 2009); Novartis
Corp. v. Teva Pharm. USA, Inc., No. 04-4473, 2007 WL 1695689, at
*26-28 (D.N.J. June 11, 2007) (finding that plaintiff failed to
establish irreparable harm, where the alleged harms were
calculable, the generic defendant had the ability to pay any
damages award, and because the possibility of loss of market
share and price erosion did not constitute irreparable harm);
Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., No. 07-
5855, 2010 WL 2428561, at *16-*17 (D.N.J. June 9, 2010)
(concluding that the "loss of market share and price erosion are
economic harms and are compensable by money damages"); Novartis
Pharm. Corp. v. Teva Pharm. Corp., No. 05-1887, 2007 WL 2669338,
at *14 (D.N.J. Sept. 6, 2007) (same); Litho Prestige v. News Am.
Publ'g, Inc., 652 F. Supp. 804, 808 (S.D.N.Y. 1986) (noting that
even "immediate, wholesale layoffs" could "be reduced to money
damages").

    Otsuka's submissions reflect, as stated above, a detailed
and nuanced ability to assess and calculate Otsuka's sales and

market share, and an ability to project the potential impact of
Defendants' entry.  (See Jarosz Dec. at ¶¶ 29-77; Jarosz
Supplemental Dec. at ¶¶ 36-74.)  Indeed, Otsuka's experts
present at least some quantifiable measure for ascertaining
economic damages, by asserting that "potential revenue losses
could be ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

(Jarosz Dec. at ¶ 50.)  Moreover, though Mr. Jarosz purported to
identify "collectability" and "recovery" challenges in his
initial declaration (see Jarosz Dec. at ¶¶ 68-77), he
specifically acknowledges in his supplemental declaration that
these Defendants "likely" possess "the financial wherewithal to
satisfy a significant adverse judgment," and indeed represents
that several Defendants' revenues exceed Otsuka's projected
damages by multiples of ████████.  (Jarosz Supplemental Dec.
at ¶¶ 71, 81.)  For these reasons, the Court concludes that
Otsuka has, upon the present record, failed to demonstrate any
irreparable harm, the first and essential underlying
consideration with respect to this factor.

   **2. Otsuka Has Not Met the "Causal Nexus" Requirement**

     The Court also finds that Otsuka has failed to demonstrate
the second and "'inextricably related'" irreparable harm
consideration, namely, a sufficient causal nexus between the

alleged infringement and Otsuka's claimed harm.  See Apple Inc.
v. Samsung Elecs. Co. Ltd., 735 F.3d 1352, 1361 (Fed. Cir. 2013)
(citation omitted) (hereinafter, "Apple III").  Critically, the
causal nexus requirement specifically distinguishes "between
irreparable harm caused by patent infringement and irreparable
harm caused by otherwise lawful competition—e.g., 'sales [that]
would be lost even if the offending feature were absent from the
accused product.'"  Id. (citation omitted).  In that respect,
the relevant inquiry for purposes of the causal nexus concerns

> not whether there is some causal relationship between
> the asserted injury and the infringing conduct, but to
> what extent the harm resulting from selling the
> accused product can be ascribed to the infringement.
> It is not enough for the patentee to establish some
> insubstantial connection between the alleged harm and
> the infringement and check the causal nexus
> requirement off the list.

Apple II, 695 F.3d at 1375.  As a result, in the face of
evidence that the allegedly infringing feature "does not drive
the demand for the product," e.g., evidence that sales would be
lost even in the absence of the allegedly infringing product, "a
likelihood of irreparable harm cannot be shown."[39]  Apple, Inc.

---

[39] Otsuka appears to suggest that this requirement somehow
changes, or applies less forcefully, in connection with
"'simple'" products, comprised of few distinguishable features.
(Otsuka's Reply at 15.)  "Contrary to [Otsuka's] suggestion,
however, the causal nexus requirement applies regardless of the
complexity of the products," Apple III, 735 F.3d at 1362, and
even if it did not, Otsuka has, under no circumstances,
demonstrated that Abilify® qualifies as a simple product, with
few, if any, features.  To the contrary, Otsuka's own

v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1324 (Fed. Cir.
2012) (hereinafter, "Apple I").  The allegedly infringing
product need not, however, be "the exclusive reason for consumer
demand." Apple III, 735 F.3d at 1364.  Rather, the infringing
feature must be one that makes the "product significantly more
desirable." Id.

    As stated above, none of these generic Defendants'
aripiprazole products include either escitalopram and/or
citalopram and, as a result, none of these products will be
infringing.  Given this, none of Otsuka's claimed harm can be
ascribed to, or be said to have a causal nexus with,
infringement of the '350 patent.  See, e.g., Briggs & Stratton
Corp. v. Chongquing Rato Power Co., Ltd., No. 13-316, 2013 WL
3972391, at *22 (N.D.N.Y. Jul. 23, 2013) (finding that the
plaintiffs failed to establish the requisite causal nexus and,
therefore, did not satisfy their burden to show irreparable
harm).  To the contrary, all of the alleged harm appears
attributable to the approaching expiration of Otsuka's '528
patent, the primary patent that discloses the specific
aripiprazole compound utilized in Abilify®, in addition to its
primary compositions and indications.  In that respect, Otsuka

---

submissions demonstrate that Abilify® manifests in a great
number of varieties, forms, and dosages, all for a variety of
different purposes.  (See, e.g., Ex. 3-A to Spadea Dec. (listing
twenty-one pages of Abilify® products).)

claims harm caused by otherwise lawful competition, namely, the
entry of these generic Defendants in the aripiprazole market,
and not by any even arguable infringement of the '350 patent.
This claim, however, fails, on its face, from demonstrating the
required causal nexus.  See Apple III, 735 F.3d at 1361.

However, even if the Court accepted Otsuka's infringement
theory — which it does not — the record in this instance
contains no dispute that at least ███████ of the time,[40] if not
more, consumers buy aripiprazole for reasons other than in
combination with a citalopram or escitalopram for treatment of a
mood disorder.  (See Otsuka's Reply at 8-9; Jarosz Supplemental
Dec. at ¶ 35.)  Although this percentage (for the combination
dosage of aripiprazole and citalopram or escitalopram) equates
to sizable annual revenues by amount, over ███████████, this
sum can hardly be described as significant to Otsuka's overall
Abilify® sales, which exceed $7.5 billion per year.  (See
Otsuka's Reply at 9.)  Nor can this percentage of sales be
construed to reflect that the combination of aripiprazole,
together with escitalopram and/or citalopram, makes the product

_____

[40] Otsuka initially represented sales associated with the '350
patent indication accounted for "approximately ██%" of
Abilify®'s overall sales.  (Otsuka's Br. at 3, 26.)  After these
Defendants uniformly challenged this assertion—and alleged that
'350 sales instead account for only ██% of Abilify®'s overall
sales—Otsuka retreated from its initial position, and clarified
its position on the relevant position in reply.

89

"significantly more desirable" to consumers.  Apple III, 735 F.3d at 1364.  Indeed, this product appears to appeal to only a minority of Abilify®'s overall market segment.  (See generally Jarosz Supplemental Dec.)  Nevertheless, Otsuka's argument in support of this factor centers upon its contention that the infringement of this narrow market will lead to catastrophic and calamitous losses across Otsuka's entire operation.  The alleged harms in this instance, however, bear little, if any, relation to the alleged infringement of Claim 1.  Therefore, rather than demonstrate the necessary causal relationship, Otsuka instead appears to seek to "leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant," Apple II, 695 F.3d at 1375, a clearly insufficient showing for purposes of this consideration.

     For all of these reasons, the Court also finds that Otsuka has failed to meet the causal nexus requirement.  See Merck & Co. v. Teva Pharm. USA, Inc., 395 F.3d 1364, 1377 (Fed. Cir. 2005) (noting nexus to commercial success for a later patent was "weak" given the existence of earlier blocking patents and regulatory exclusivities).  The Court finds that Otsuka has not shown a likelihood of irreparable harm to be caused by these generic product launches.

90

### 3. Otsuka's Delay in Requesting Injunctive Relief Suggests Lack of Urgency

Finally, the Court turns to Otsuka's delay—an important factor bearing on the need for a preliminary injunction, particularly irreparable harm.  See Pfizer, Inc. v. Teva Pharm., USA, Inc., 429 F.3d 1364, 1382 (Fed. Cir. 2005) (generally noting that delay "negates the idea of irreparability"); Hybritech, 849 F.2d at 1457 (noting that a "period of delay" constitutes "one factor to be considered by a district court in its analysis of irreparable harm"); T.J. Smith & Nephew Ltd. v. Consol. Medical Equip. Corp., 821 F.2d 646, 648 (Fed. Cir. 1987) (finding that the plaintiff's delay in seeking an injunction negated any irreparable harm).  Delays, strategic or otherwise, have plagued these actions from their inceptions.  Indeed, the parties have, in both Court appearances and their briefing, all decried the multitude of delays in service and the exchange of discovery relevant to the parties' various contentions, and the parties in many of the older cases filed in 2014 have, despite the default provisions of the Local Patent Rules,[41] unduly stalled this litigation through protracted disagreements on the scope of discovery confidentiality orders.[42]  (See, e.g.,

---

[41] See L. Civ. R. 2.2.
[42] Otsuka, for its part, has prepared and submitted an incredibly detailed spreadsheet describing the delays in these actions, all of which Otsuka attributes, in relevant part, to these Defendants.  (See Ex. 7 to Fues Dec.)

Hetero's Sur-reply at 1-2 (describing some of the global delays).) Despite alleging that Defendants have obstructed discovery, the record reflects few instances in which Otsuka sought judicial intervention and a defendant was found in default.

The delay most relevant for purposes of the Court's consideration of irreparable harm is Otsuka's delay in requesting injunctive relief when the inevitable April 20, 2015 expiration date of the '528 patent approached.  In that respect, the Court notes that Otsuka filed the first of these related patent infringement actions more than 13 months ago on February 18, 2014, see Otsuka Pharm. Co., Ltd. v. Torrent Pharm., Inc., Civil Action No. 14-1078 (JBS/KMW), followed shortly thereafter by a cascade of twenty-four related actions.[43]

---

[43] See Otsuka Pharm. Co., Ltd. v. Alembic Global Holding SA, Civil Action No. 14-2982 (JBS/KMW) (filed May 9, 2014); Otsuka Pharm. Co., Ltd. v. Zydus Pham. USA Inc., Civil Action No. 14-3168 (JBS/KMW) (filed May 16, 2014); Otsuka Pharm. Co., Ltd. v. Aurobindo Pharma Ltd., Civil Action No. 14-3306 (JBS/KMW) (filed May 23, 2014); Otsuka Pharm. Co., Ltd. v. Intas Pharm. Ltd., Civil Action No. 14-3996 (JBS/KMW) (filed June 20, 2014); Otsuka Pharm. Co., Ltd. v. Zydus Pham. USA Inc., Civil Action No. 14-3168 (JBS/KMW) (filed May 16, 2014); Otsuka Pharm. Co., Ltd. v. Sun Pharm. Indus., Ltd., Civil Action No. 14-4307 (JBS/KMW) (filed July 7, 2014); Otsuka Pharm. Co., Ltd. v. Mylan Inc., Civil Action No. 14-4508 (JBS/KMW) (filed July 11, 2014); Otsuka Pharm. Co., Ltd. v. Torrent Pharm., Inc., Civil Action No. 14-4671 (JBS/KMW) (filed July 25, 2014); Otsuka Pharm. Co., Ltd. v. Zhejiang Huahai Pharm. Co., Civil Action No. 14-5537 (JBS/KMW) (filed September 4, 2014); Otsuka Pharm. Co., Ltd. v. Ajanta Pharm. Ltd., Civil Action No. 14-5876 (JBS/KMW) (filed September 19, 2014); Otsuka Pharm. Co., Ltd. v. Teva Pharm. USA, Inc.,

Despite having numerous pending, related actions in this
Court for more than one year, Otsuka first mentioned its
intention to file motions for preliminary injunctions by letter
dated March 9, 2015, in excess of thirteen months after the
filing of its first ANDA action.  Otsuka attempts to gloss over
its delays, by claiming that these Defendants have, at all
times, retained "exclusive[]" control over the timing of these
actions, and have "hampered" and "frustrated" Otsuka's efforts
to "timely adjudicate its infringement claims" by delaying
service of paragraph IV certifications.  (Otsuka's Reply at 2.)
Nevertheless, Otsuka has long known of the coming expiration of

---

Civil Action No. 14-5878 (JBS/KMW) (filed September 19, 2014);
Otsuka Pharm. Co., Ltd. v. Intas Pharm. Ltd., Civil Action No.
14-6158 (JBS/KMW) (filed October 2, 2014); Otsuka Pharm. Co.,
Ltd. v. Sun Pharm. Indus., Ltd., Civil Action No. 14-6397
(JBS/KMW) (filed October 6, 2014); Otsuka Pharm. Co., Ltd. v.
Teva Pharm. USA, Inc., Civil Action No. 14-6398 (JBS/KMW) (filed
September 19, 2014) (filed October 10, 2014); Otsuka Pharm. Co.,
Ltd. v. Aurobindo Pharma Ltd., Civil Action No. 14-6890
(JBS/KMW) (filed October 31, 2014); Otsuka Pharm. Co., Ltd. v.
Lupin Ltd., Civil Action No. 14-7105 (JBS/KMW) (filed November
3, 2014); Otsuka Pharm. Co., Ltd. v. Actavis Elizabeth LLC,
Civil Action No. 14-7106 (JBS/KMW) (filed November 10, 2014);
Otsuka Pharm. Co., Ltd. v. Zydus Pham. USA Inc., Civil Action
No. 14-7252 (JBS/KMW) (filed November 20, 2014); Otsuka Pharm.
Co., Ltd. v. Alembic Pharm., Ltd., Civil Action No. 14-7405
(JBS/KMW) (filed November 26, 2014); Otsuka Pharm. Co., Ltd. v.
Apotex Corp., Civil Action No. 14-8074 (JBS/KMW) (filed December
24, 2015); Otsuka Pharm. Co., Ltd. v. Hetero Drugs, Ltd., Civil
Action No. 15-161 (JBS/KMW) (filed January 8, 2015); Otsuka
Pharm. Co., Ltd. v. Amneal Pharm. Co, Ltd., Civil Action No. 15-
1585 (JBS/KMW) (filed March 2, 2015); Otsuka Pharm. Co., Ltd. v.
Sandoz Inc., Civil Action No. 15-1716 (JBS/KMW) (filed March 9,
2015); Otsuka Pharm. Co., Ltd. v. Indoco Remedies Ltd., Civil
Action No. 15-1967 (JBS/KMW) (filed March 17, 2015).

its '528 patent, has been preparing for the introduction of generic versions of Abilify since no later than 2009, at which time it advised investors of inevitable and temporary reductions in revenues as a result of generic entry into the aripiprazole market.  (See, e.g., Ex. 5 to Hunnicutt Dec. (press release concerning anticipate drop in sales following the '528 patent's expiration).)  Given these circumstances, absent a sufficient explanation, not offered or found here, Otsuka's delay proves substantial.  See High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995) (finding that a 17 month delay militated "against the issuance of a preliminary injunction by demonstrating that there [was] no apparent urgency to the request for injunctive relief").  Moreover, this delay undercuts the urgency that forms the cornerstone of injunctive relief; indeed, it indicates a lack of urgency.  See Quad/Tech, Inc. v. Q.I. Press Controls B.V., 701 F. Supp. 2d 644 (E.D. Pa. 2010), aff'd, 413 F. App'x 278 (Fed. Cir. 2011).[44]

---

[44] The Court nonetheless endeavored with all parties to set a last-minute briefing and argument schedule on March 16, 2015, accelerating Otsuka's filing of motions with initial briefing, Defendants' oppositions, and Otsuka's replies and Defendants' sur-replies, all completed by April 6th, so that at least the motions for TRO could be hearing on April 10th and decided before April 20th.  Otsuka was perhaps disadvantaged by its delay, since it was required to complete its initial outlines of positions on injunctive relief in the 25 related cases within just 3 days after the March 16th conference.  In the end, Otsuka and each

For this secondary reason, the Court finds that Otsuka has not demonstrated the urgency in avoiding irreparable harm, and turns to the balance of hardships.

**C. The Balance of Hardships Favors these Defendants[45]**

"The balance of hardships factor 'assesses the relative effect of granting or denying an injunction on the parties.'" Apple III, 735 F.3d at 1371 (quoting i4i Ltd. P'ship, 598 F.3d at 862). Therefore, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Defense Council, Inc., 555 U.S. 7, 24 (2008).

The hardship on a preliminarily enjoined generic which has taken affirmative steps to enter the market can be devastating. On the other hand, the hardship on a patentee denied an injunction after showing a strong likelihood of success on validity and infringement consists of an equally serious

---

generic Defendant intending to launch its product have had a full and fair opportunity to be heard.  Commendably, all parties met these demanding deadlines, and the day-long TRO hearing explored all issues.

[45] Having concluded that Otsuka has failed to demonstrate a likelihood of success and irreparable harm, the Court need not discuss the remaining equitable factors.  See, e.g., McDavid Knee Guard, Inc. v. Nike USA, Inc., 683 F. Supp. 2d 740, 744 (N.D. Ill. 2010) ("If the moving party fails to demonstrate either [likelihood of success or irreparable harm], then a district court considering a motion for preliminary injunction need not proceed further with its analysis to deny the preliminary injunction motion.")  Nevertheless, in the interests of the completeness, the Court will continues its analysis.

impingement on its right to exclude. See Ill. Tool Works, Inc.
v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990).  In the
present case, however, Otsuka's weak showing of likelihood of
success tips the balance of hardships towards these generic
Defendants.  See id.

It appears that these Defendants have all taken affirmative
steps to enter the aripiprazole market, by developing and
testing aripiprazole products, preparing ANDAs, seeking
regulatory approval from the FDA, ordering raw materials, and
preparing manufacturing and supply pipelines.  (See, e.g.,
Torrent's Br. at 14; Alembic's Br. at 27; Zydus's Br. at 36-37;
Sun's Br. at 14; Teva's Br. at 38; Actavis's Br. at 26-27;
Apotex's Br. at 27-28; Hetero's Br. at 27; Sandoz's Br. at 29.)
The issuance of an injunction would seriously erode these and
related efforts.  Indeed, these generic Defendants would face
the loss of all of the "costly enterprises" made to prepare
their products "in readiness of ultimate FDA approval and
commercial launch" on April 20, 2015.  Graceway Pharm., 697 F.
Supp. 2d at 605.

In addition, the issuance of a TRO would deprive these
Defendants of the advantage of being an early market entrant,
and may force these Defendants to ultimately launch with
competitors that would otherwise have only been able to launch
after these early entrants. See, e.g., Bracco Diagnostics, Inc.

96

v. Shala/a, 963 F. Supp. 20, 29 (D.D.C. 1997) ("[T]here is a
significant economic advantage to receiving first approval and
being the first company to enter the market, an advantage that
can never be fully recouped through money damages or by 'playing
catch-up.'"); see also Mova Pharm. Corp. v. Shala/a, 140 F.3d
1060, 1066 n.6 (D.C. Cir. 1998) (finding that party will be
"harmed by the loss of its 'officially sanctioned head start'");
Sandoz, Inc. v. FDA, 439 F. Supp. 2d 26, 32-33 (D.D.C. 2006)
(finding that delayed entry to market tilts the balance of
hardships).

        The Court must, however, note that, unlike the majority of
these generic Defendants, ███████████████████████████
███████████████████████████████████████, thereby
limiting Otsuka's ability to shoulder significant losses in
revenue.  (See Jarosz Dec. at ¶¶ 80-85.)  As a result, counsel
for Otsuka argued on the oral argument record on April 10, 2015,
that the balance of hardships favors Otsuka, because the
Defendants have the ability to absorb any harm caused by an
injunction by ████████████████████████████████████████
███████████████████████.  Nevertheless, given that Otsuka's
claimed harms derive from the natural expiration of the '528
patent, and not from the patent at issue in these temporary
restraining order proceedings, the Court does not find any

absorption, accepted as true, a burden that these Defendants should be required to face.

For all of these reasons, the Court finds that the balance of hardships tips in favor of these generic Defendants.

**D. The Public Interest Counsels against the Issuance of an Injunction**

The public interest factor requires Otsuka to demonstrate that the entry of an injunction "'will not disserve the public interest.'"  Abbott Labs., 544 F.3d at 1366.

In enacting the Hatch-Waxman Act, Congress "'struck a balance between two competing policy interests: (1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market.'"  Dey Pharma, LP v. Sunovion Pharm. Inc., 677 F.3d 1158, 1159 (Fed. Cir. 2012) (quoting Andrx Pharm., Inc. v. Biovail Corp., 276 F.3d 1368, 1371 (Fed. Cir. 2002)).  The public interest therefore encourages, on the one hand, "get[ting] generic drugs into the hands of patients at reasonable prices-fast."  In re Barr Labs., Inc., 930 F.2d 72, 76 (D.C. Cir. 1991).  On the other, however, competition enhances the public interest by encouraging generic drugs to enter the market upon the conclusion of relevant patent exclusivity.  See Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1346 (Fed. Cir. 2013) ("competition serves the

public interest"); see also Graceway Pharm., 697 F. Supp. 2d at 609.

The FDA approved Otsuka's NDA 21-436 in 2002, and the pediatric exclusivity period associated with the '528 patent expires on April 20, 2015. Therefore, Otsuka has long enjoyed the exclusive rights to the aripiprazole market in the United States and has, in turn, been duly rewarded for bringing its innovation to market. In fact, Otsuka's aripiprazole exclusivity has generated, in the last eight years alone, over $100 billion in revenue. (See generally Jarosz Dec.) The public's interest in encouraging and rewarding innovation has been well served already. Given this, Otsuka has had ample opportunity to fully and completely realize a return on its investment, many times over, and to adjust its business as it deemed necessary in order to address the loss of exclusivity it knew, for years, rested upon the horizon.

Given Otsuka's monopoly in aripiprazole, the public interest that at one point favored them has now tipped in favor of Defendants, because although Hatch-Waxman seeks to foster innovation, it also encourages finality upon the expiration of a long protected pharmaceutical patent exclusivity. Therefore, there can be little question that extending Otsuka's protection from competition in the absence of Otsuka's likelihood of success on the merits would result in a disservice to the public

99

interest.  Indeed, under these circumstances, the public
interest would benefit from increased competition from these
generic Defendants that have waited patiently for the expiration
of the '528 exclusivity period.

Finally, the Court must note that, "neither the public
interest nor equity favors the grant of an injunction against
one who does not infringe." Novo Nordisk of N. Am. v. Genetech,
Inc., 77 F.3d 1364, 1371 (Fed. Cir. 1996) (vacating lower
court's grant of preliminary injunction).  As stated above,
Otsuka, upon the present record, has not demonstrated that these
generic Defendants are likely to infringe the '350 patent.  So,
for that reason too, the public interest would be particularly
disadvantaged by permitting Otsuka to extend its market
exclusivity based upon its assertion of the later-filed and
later-expiring '350 patent.

The Court, accordingly, concludes that the public interest
counsels against the issuance of temporary restraints.

## VI.  CONCLUSION

An injunction constitutes a drastic remedy and Otsuka bears
the burden of establishing an entitlement to such extraordinary
relief.  See, e.g., Nitro Leisure Prods., LLC v. Acushnet Co.,
341 F.3d 1356 (Fed. Cir. 2003).  For the reasons stated above,
the Court concludes that Otsuka has failed to meet its burden in

these instances.[46]  The record in these thirteen Hatch-Waxman Act cases is sufficiently developed at this TRO stage that the Court is confident that Otsuka has not shown a likelihood of success on its induced infringement claims, nor has Otsuka demonstrated it will suffer immediate and irreparable harm if it is later determined that these generic competitors have wrongfully entered the market.  Moreover, the Court has found that the balance of hardships slightly favors the Defendants, and that the public interest is better served by denying this Temporary Restraining Order.  As a result, Otsuka's motions for a temporary restraining order will be denied, and these generic Defendants shall, subject to regulatory approval, be permitted to launch their generic aripiprazole products after April 20, 2015.  An accompanying Order will be entered.[47]

| | |
|---|---|
| **April 16, 2015** | **s/ Jerome B. Simandle** |
| Date | JEROME B. SIMANDLE |
| | Chief U.S. District Judge |

---

[46] As a result, the Court need not reach the issue of an appropriate bond.

[47] This Opinion is being filed on the public docket in slightly redacted form to protect certain confidential information, as discussed in the TRO hearing on April 10, 2015 and in the Sealing Order of today's date.  An unredacted version of the Opinion is being filed under seal and will be available to those attorneys who have signed the requisite stipulated confidentiality agreements.  The Order, on the other hand, has not been redacted.